**Robert W. CHESTER, Regional Director of the NATIONAL LABOR RELATIONS BOARD for Region Six, for and on behalf of the National Labor Relations Board, Plaintiff,**

v.

**GRANE HEALTHCARE CO., and/or Ebensburg Care Center, LLC d/b/a Cambria Care Center, Single Employer, Defendants.**

Civil Nos. 3:2010–225, 3:2010–244.

United States District Court,
W.D. Pennsylvania.

June 2, 2011.

Patricia J. Daum, National Labor Relations Board, Pittsburgh, PA, for Plaintiff.

Richard J. Antonelli, John A. McCreary, Jr., Rebecca J. Dick–Hurwitz, Babst Calland Clements and Zomnir PC, Pittsburgh, PA, for Defendants.

## *MEMORANDUM*

KIM R. GIBSON, District Judge.

This matter comes before the Court on Plaintiff's Motion to Hear and Decide Complaint for Injunction on Basis of the Record Developed Before Administrative Law Judge to be Supplemented by Just and Proper Evidence (Document No. 4) and Plaintiff's Motion to Hear and Decide Complaint for Injunction under Section 10(j) of the National Labor Relations Act, as Amended, on the Basis of the Record Developed Before Administrative Law Judge David Goldman to be Supplemented by Just and Proper Evidence (Document No. 19). The Court finds that an interim bargaining order shall issue, but an instatement order for Ms. Hagerich and Mr. Mulhearn shall not issue. The Court now **GRANTS** this motion in part, and **DENIES** it in part.

\* \* \*

### Facts

The Court relies on the recitation of facts in the Decision of Administrative Law Judge David I. Goldman to explore the events leading up to the instant motions.[1] These cases involve a company, Grane Healthcare Co., that acquired a nursing home that for many years had been owned and operated by a county employer. Principals of the company established a new entity, Ebensburg Care Center, LLC, d/b/a Cambria Care Center for the purpose of operating the nursing home. The new employer hired most, but not all, of the employees who had worked for the nursing home when it was county-owned. The new employer refused to recognize or bargain with the two unions that represented employees at the county nursing home. The government alleges that the employer is a successor employer under National Labor Relations Board (Board) precedent, and that its refusal to recognize and bargain with the unions violates the National Labor Relations Act (Act). The government further contends that the employer's decision not to hire certain of county's employees—specifically, certain employees who were officials of one union and another employee who was active in attempting to assist her union in securing a meeting with the new owners—was unlawfully motivated in violation of the Act. Finally, the government alleges that the buyer of the nursing home (Grane Healthcare Co.), which assists in managing the nursing home, along with the operating entity (Ebensburg Care Center, LLC, d/b/a Cambria Care Center) it established, are a single employer under the Act's precedents.

On January 8, 2010, Local Union No. 1305, Professional and Public Service Employees of Cambria County a/w the Laborers' International Union of North America (Laborers or Local 1305) filed an unfair labor practice charge, amended May 24, 2010, against Grane Healthcare Co. (Grane) and/or Ebensburg Care Center LLC temporarily d/b/a Cambria Care Cen-

---

1. The Decision and Recommendation Order of Administrative Law Judge David I. Goldman dated December 16, 2010 is docketed as Document 37–1.

ter (Cambria Care), docketed by Region 6 of the Board as Case 6–CA–36791.

On January 15, 2010, SEIU Healthcare Pennsylvania, CTW, CLC (SEIU) filed an unfair labor practice charge, amended May 24, 2010, against Grane and/or Cambria Care docketed by Region 6 of the Board as Case 6–CA–36803. On April 29, 2010, SEIU filed another charge, docketed by Region 6 as Case 6–CA–36915, which was amended by SEIU on June 30, 2010. On May 28, 2010, based on an investigation into the charge filed by the Laborers, the Board's General Counsel, by the Acting Regional Director of Region 6, issued a complaint and notice of hearing against Grane and Cambria Care alleging violations of the Act in Case 6–CA–36791, The complaint alleged that Grane and Cambria Care constituted a single employer within the meaning of the Act, and that they unlawfully failed and refused to recognize and bargain with the Laborers as the collective-bargaining representative of a bargaining unit of employees in violation of Section 8(a)(1) and (5) of the Act. The complaint further alleged that Respondents unlawfully refused to hire applicants Mark Mulhearn, Beverly Weber, Joseph Billy, and Sherry Hagerich, in violation of Section 8(a)(1) and (3) of the Act.

On July 1, 2010, the Board's Acting General Counsel, by the Regional Director for Region 6, issued an order consolidating Cases 6–CA–36803 and 6–CA–36915, and issued a second complaint against Grane and Cambria Care. Similar to the complaint issued in Case 6–CA–36791, the complaint in these consolidated cases alleged that Grane and Cambria Care constituted a single employer within the meaning of the Act, and alleged that Respondents unlawfully failed and refused to recognize SEIU as the collective-bargaining representative of a bargaining unit of employees, in violation of Section 8(a)(1) and (5) of the Act. The complaint further alleged that Respondents unlawfully unilaterally implemented a change in job duties in violation of Sections 8(a)(1) and (5) of the Act. Finally, the complaint alleged that Respondents unlawfully refused to hire applicant Roxanne Lamer, in violation of Sections 8(a)(1) and (3) of the Act.

By further Order issued July 1, 2010, the Board's Acting General Counsel, by the Regional Director for Region 6, ordered that Case 6–CA–36791 be consolidated with Cases 6–CA–36803 and 6–CA–36915. Respondents filed timely answers denying all violations of the Act. A hearing in these cases was conducted before Administrative Law Judge David I. Goldman on July 21–23, and August 16–19, 2010, in Ebensburg, Pennsylvania. Counsel for the General Counsel, the SEIU, and Respondent filed briefs in support of their positions by October 8, 2010.

This case came before this court on August 26, 2010, when Plaintiff, Robert W. Chester, Regional Director for Region Six of the National Labor Relations Board, for and on Behalf of the National Labor Relations Board, filed a complaint against Grane Healthcare Co. and/or Ebensburg Care Center LLC D/B/A Cambria Care Center, Single Employer (Document No. 1). On September 10, 2010, Plaintiff filed a Motion to Hear and Decide Complaint for Injunction on Basis of the Record Developed before Administrative Law Judge to be Supplemented by Just and Proper Evidence (Document No. 4). The Court held an evidentiary hearing to determine whether injunctive relief is "just and proper" on September 28, 2010. Following the hearing, Plaintiff filed a Motion to Hear and Decide Complaint for Injunction under Section 10(j) of the National Labor Relations Act, as amended, on the Basis of the Record Developed Before Administrative Law Judge David Goldman to be Supplemented by Just and Proper Evidence

(Document No. 19). On October 1, 2010, Defendants filed a supplemental brief in opposition to Plaintiff's motion to hear and decide complaint for injunction. On October 4, 2010, the Court held an injunction hearing. On October 25, 2010, Defendants filed a brief in opposition to Plaintiff's motion to hear and decide complaint for injunction (Document No. 24). On November 19, 2010, Defendants filed Defendants' post-hearing memorandum (Document No. 33). On November 19, 2010, Plaintiff filed a brief in support of complaint, for injunctive relief pursuant to Section 10(j) of the National Labor Relations Act (Document No. 34).

On December 16, 2010, Administrative Law Judge David I. Goldman issued his Decision and Recommended Order in the underlying consolidated unfair labor practice cases, 6–CA–36791, 6–CA–36803 and 6–CA–36915. Administrative Law Judge Goldman found that Respondent Grane Healthcare Co. and Respondent Ebensburg Care Center LLC (a single employer, collectively referred to as Respondent in that matter) engaged in certain unfair labor practices. He further found that they are joint and severally liable for the unfair labor practices found and must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Having found that Respondent violated Sections 8(a)(5) and (1) by failing and refusing to bargain with Local 1305 as the collective-bargaining representative of an appropriate bargaining unit of employees (described above), Administrative Law Judge Goldman ordered that Respondent shall recognize, and, upon request, bargain with Local 1305 as the exclusive representative of the unit employees and, if an understanding is reached, embody the understanding in a signed agreement.

Having found that Respondent violated Sections 8(a)(3) and (1) of the Act by re-fusing to hire Mark Mulhearn, Sherry Hagerich, Beverly Weber, Joseph Billy, and Roxanne Lamer, Administrative Law Judge Goldman ordered that Respondent shall offer them instatement to the positions for which they applied or, if those positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges they would have enjoyed absent the discrimination against them. Administrative Law Judge Goldman ordered that Respondent shall make these individuals whole for any loss of earnings and other benefits that they may have suffered as a result of the discrimination against them, computed on a quarterly basis, in the manner prescribed in *F.W. Woolworth Co.*, 90 NLRB 289 (1950), plus daily compound interest as prescribed in *Kentucky River Medical Center*, 356 NLRB No. 8 (2010). Administrative Law Judge Goldman ordered that Respondent shall remove from its files any reference to the unlawful refusal to hire Mulhearn, Hagerich, Weber, Billy, and Lamer, and, within three days thereafter, notify each of them in writing that this has been done and that the refusals to hire will not be used against them in any way. Administrative Law Judge Goldman ordered that Respondent shall further be ordered to refrain from acting in any similar or related manner abridging any of the rights guaranteed to employees by Section 7 of the Act. Administrative Law Judge Goldman ordered that Respondent shall post an appropriate informational notice, as described in the attached Appendix. Administrative Law Judge Goldman ordered that this notice shall be posted in the Employer's facility or wherever the notices to employees are regularly posted for 60 days without anything covering it up or defacing its contents. Administrative Law Judge Goldman ordered that in addition to physical posting of paper notices, notices shall be distribut-

ed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. When the notice is issued to the Employer, it shall sign it or otherwise notify Region 6 of the Board what action it will take with respect to this decision. Respondents have appealed this decision.

Following this decision of the administrative law judge, Plaintiff filed a motion to withdraw the complaint for injunction under Section 10(j) of the National Labor Relations Act as to the SEIU (Document No. 37). The Court granted this motion (Document No. 39). Plaintiff also filed a document styled as a status report and letter advising of issuance of decision and recommended order by ALJ (Document No. 38). In reply to this status report, Defendants filed Defendants' Position with Respect to Effect of ALJ Decision (Document No. 48). In this reply, Defendants indicated that they take exception with Administrative Law Judge Goldman's decision, and will appeal it.

The Court now addresses the two pending motions: Plaintiff's Motion to Hear and Decide Complaint for Injunction on Basis of the Record Developed Before Administrative Law Judge to be Supplemented by Just and Proper Evidence (Document No. 4) and Plaintiff's Motion to Hear and Decide Complaint for Injunction under Section 10(j) of the National Labor Relations Act, as amended, on the Basis of the Record Developed before Administrative Law Judge David Goldman to be Supplemented by Just and Proper Evidence (Document No. 19).

## Jurisdiction

The Court has jurisdiction over this case pursuant to Section 10(j) of the National Labor Relations Act (29 U.S.C. 160(j)).

## Analysis

In this case, the Board seeks injunctive relief pursuant to § 10(j) of the Act. Plaintiff, relying on Third Circuit precedents contends that an injunction shall issue where a two-factor test is satisfied—(1) "there is reasonable cause to believe that an unfair labor practice has occurred" and (2) that the entry of an injunction would be "just and proper." *See e.g., Hirsch v. Dorsey Trailers, Inc.,* 147 F.3d 243, 247 (3d Cir.1998) (citing *Pascarell v. Vibra Screw, Inc.,* 904 F.2d 874, 877 (3d Cir. 1990)). Defendants counter that the precedents supporting this two-factor test are no longer valid following the Supreme Court's opinion in *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Defendants assert that § 10(j) requires that Plaintiff establish the traditional four elements necessary for injunctive relief: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) citing *See Munaf v. Geren,* 553 U.S. 674, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008); *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

This case turns on which standard is appropriate: the two-factor test, supported by nearly five decades of Third Circuit precedents, or the traditional four-factor test, endorsed by leading Supreme Court precedents. This Court concludes that the Supreme Court's precedents, stretching from *Romero–Barcelo* in 1982 to *Winter* in 2008, suggest a clear and

consistent message to the lower courts: courts are to apply the traditional four-factor test in the absence of a "necessary and inescapable" congressional intent to depart from traditional equitable standards. *Romero–Barcelo*, 456 U.S. at 313, 102 S.Ct. 1798, § 10(j) lacks such intent.

The Third Circuit has not addressed the applicability of the four-factor test to § 10(j) injunctions following *Winter*. This Court need not wait for further directions from other courts. Our mandate arrives from the highest Court in the Land, the United States Supreme Court. *See e.g., Planned Parenthood of SE Pa. v. Casey*, 947 F.2d 682, 698 (3rd Cir.1991), aff'd in part, rev'd in part, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("a change [by the Supreme Court] in the legal test or standard governing a particular area is a change binding on lower courts that makes results reached under a repudiated legal standard no longer binding"); *U.S. v. City of Philadelphia*, 644 F.2d 187, 192 n. 3 (3rd Cir.1980) ("As an inferior court in the federal hierarchy, we are, of course, compelled to apply the law announced by the Supreme Court as we find it on the date of our decision").

With Section 10(j), Congress did not enact any special equitable procedures or otherwise suggest that the Board should be held to a lesser standard than other litigants seeking injunctive relief. The Regional Director has not advanced any principled reason to support the argument that he is exempt from the broad instruction that *Winter* and earlier Supreme Court cases have given to litigants and to the federal judiciary. With the utmost respect and deference, the Court finds that this Circuit's longstanding precedents are incompatible and irreconcilable with these Supreme Court precedents, as well as persuasive precedents from our sister circuits. Petitions for injunctions sought under § 10(j) of the Act must satisfy the traditional four factors of equitable relief.

## I. "Just and Proper" Injunctive Relief

### a. The Evolution of the Third Circuit's § 10(j) Standard

In order to appreciate where our precedents stand today, it is helpful to trace the evolution of the two-part test for § 10(j), § 10(j) provides, in part "[t]he Board shall have power ... to petition any United States district court ... for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems *just and proper.*" The Third Circuit was first confronted with constructing the meaning of the term "just and proper" in *Eisenberg for and on Behalf of N.L.R.B. v. Hartz Mountain Corp.*, 519 F.2d 138 (1965). When a Court is confronted with interpreting a previously undefined term, it is generally helpful to look elsewhere in the same statute, and try to glean a meaning from the surrounding contexts. In *Hartz Mountain*, the Third Circuit did just that to interpret the meaning of "just and proper"—Sections 10(j) and 10(l)[2] of the Act both use that term:

---

**2.** 29 U.S.C. § 160(*l*) ("Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 8(b) [section 158(b) of this title], or section 8(e) [section 158(e) of this title] or section 8(b)(7) [section 158(b)(7) of this title], the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has *reasonable cause* to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice

The present appeal requires us to consider for the first time the proper application of Section 10(j). However, some guidance is provided by this court's opinion, handed down nearly twenty years ago, on an appeal from an order that had granted temporary relief under the companion Section 10(*l*), In *Schauffler v. Highway Truck Drivers & Helpers, Local* 107, 3d Cir.1956, 230 F.2d 7, we held that to justify Section 10(*l*) relief, a district court must "find that there is reasonable cause to believe that a violation of the act as charged has been committed" and then "proper(ly) exercise ... Judicial discretion" as to the appropriateness of particular relief. *Hartz Mountain Corp.*, at 140–141 (citations omitted).

Five years later the Third Circuit reaffirmed, and restated this standard:

> In *Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138, 143 (3d Cir.1975), we held that reasonable cause to believe a violation of the act has occurred, a standard for injunctive relief originally developed in cases arising under section 10(*l*) of the Act, is also applicable to section 10(j) proceedings. Eisenberg for and on Behalf of *N.L.R.B. v. Wellington Hall*, 651 F.2d 902 (3rd Cir.1981).

The reasonable cause standard imposes a "low threshold of proof" on the NLRB. *See Eisenberg v. Wellington Hall Nursing Home*, 651 F.2d at 905, This standard is satisfied when the NLRB legal theory is "substantial and not frivolous," and viewing the contested factual issues favorably to the Board, sufficient evidence supports the theory. *Pascarell v. Vibra Screw Inc.*, 904 F.2d at 882 citing *Kobell v. Suburban*

*Lines, Inc.*, 731 F.2d 1076, 1084 (3d Cir. 1984).

The Third Circuit has found that injunctive relief is "just and proper" under Section 10(j) "when the nature of the alleged [violations is] likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation," The "critical determination for the court is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiations will be impaired." *Pascarell v. Vibra Screw Inc.*, 904 F.2d at 879. An injunction is appropriate when a failure to grant it would "prevent the Board, acting within its reasonable expedition, from effectively exercising its ultimate remedial powers." *Kobell v. Suburban Lines Inc.*, 731 F.2d at 1091–1092.

### b. Critiques of the Third Circuit's § 10(j) Standard

It is questionable, as a matter of first impression, whether it was appropriate for the Third Circuit to import the reasonable cause standard from 10(*l*) into 10(j), Textually, while both §§ 10(j) and 10(*l*) use the term "just and proper," only section 10(*l*) includes a reference to "reasonable cause." As the Fourth Circuit noted in *Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, " § 10(j) includes no explicit reference to 'reasonable cause.' " 570 F.3d 534, 541 (4th Cir.2009). Rather, the plain language of the statute requires only that the district court award injunctive relief that is "just and proper." Congress did not impose a requirement for a "reasonable cause" analysis.

in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems *just and proper,* notwithstanding any other provision of law ...") (emphasis added).

Beyond the mere textual disparity between the two statutes, the Third Circuit's analogizing "overlooks important differences between § 10(j) and § 10($l$) relief." *Muffley*, at 541. § 10($l$) is mandatory, can only be invoked after an investigation that provides the Board with "reasonable cause" that a labor violation occurred, and if such cause is found, the Board must bring this injunction prior to the issuance of a complaint § 10(j) is discretionary, can be invoked at any time, even in the absence of an investigation, after a complaint is filed, whether or not any cause, reasonable, or otherwise, exists. The aims of §§ 10(j) and 10($l$) are quite different. This critical distinction vitiates the helpfulness of the Third Circuit's transplant of the "reasonable cause" standard from 10($l$) to 10(j).

Section 10($l$) is mandatory: the General Counsel "shall" seek injunctive relief in the district court if he or she possesses *"reasonable cause* to believe such charge [of unfair labor practices] is true and that a complaint should issue." The General Counsel could only make such a finding of "reasonable cause" following a statutorily required considered investigation on the merits. Section 10($l$) "requires the Board to seek injunctive relief if an investigation yields 'reasonable cause' to believe that secondary boycotts or other identified kinds of especially grave violations are in progress." *Kinney*, at 489. The Board can only pursue interim relief under Section 10($l$) "after uncovering enough evidence to warrant the bringing of formal charges and in addition deciding that the case is sufficiently important to call for interim relief." *Kinney*, at 489.

Here, " '[r]easonable cause' under § 10($l$) thus serves two functions: it requires the Board to investigate before filing suit, and it allows the Board to filter out claims of violations that do not justify litigation." *Id.* In short, § 10($l$)'s " 'rea-

sonable cause' requirement has to do with the Board's own obligations under the Act—not with a constraint on the equitable powers of the district court once its jurisdiction has been properly invoked." *Miller for and on Behalf of N.L.R.B. v. California Pacific Médical Center*, 19 F.3d 449, 456 (9th Cir.1994). To transport this "reasonable cause" standard to 10(j) appears questionable.

In contrast, section 10(j) is discretionary—"[t]he Board shall have power," but need not "petition any United States district court ... for appropriate temporary relief." The petition could be made, before, or as in this case, after the complaint is filed. Further, the petition need not be made upon "reasonable cause" following an investigation; rather, it can be issued whenever "unfair labor practices" are merely "alleged to have occurred." Indeed, "having [permitted] the Board not to file suit under § 100 until the administrative complaint has been lodged, Congress did not need to require any further minimum investigation." *Kinney*, at 490. The efficacy of this two-factor test is even further unclear following the Supreme Court's 1982 opinion in *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)

In *Romero–Barcelo*, the Court reaffirmed the validity of the traditional four-factor equitable test for injunctions, unless there was a "necessary and inescapable" congressional intent to depart from traditional equitable standards. *Romero–Barcelo*, 456 U.S. at 313, 102 S.Ct. 1798, The phrase "just and proper" does not seem to evince such an intent. *See also Muffley*, at 542 ("Thus no language in § 10(j) compels departure from the traditional four-part test for equitable relief; in such circumstances, *Romero–Barcelo* indicates that courts should apply that test."). If anything, capacious language such as "just and proper"

seems to instruct judges to rely on the broad equitable powers our courts have exercised for over two centuries. *Id.* ("To the contrary, 'just and proper' is another way of saying 'appropriate' or 'equitable.'"). In the absence of a "necessary and inescapable" intent, when a federal statute authorizes injunctive relief, the presumption is that Congress intends the courts to exercise their traditional equitable discretion—namely the four-factor test. *Romero–Barcelo,* at 311–20, 102 S.Ct. 1798,

Notwithstanding *Romero–Barcelo,* prior to *Winter* this issue continued to split the Circuits. The Third, Fifth, Tenth, and Eleventh Circuits applied the "reasonable cause" standard to 10(j) injunctions through the two-factor test. *See e.g., Sharp ex rel. N.L.R.B. v. Webco Industries, Inc.* 225 F.3d 1130, 1133 (10th Cir. 2000) ("to grant a § 10(j) petition, the district court considers whether there was (1) "reasonable cause to believe" that respondent violated the Act; and (2) whether the relief sought is 'just and proper.'") (citations omitted); *Arlook for and on Behalf of N.L.R.B. v. S. Lichtenberg & Co.,* 952 F.2d 367 (11th Cir.1992) ("the Fifth Circuit announced that a district court should grant the Board's request for § 10(j) equitable relief only when (1) there is reasonable cause to believe that the alleged unfair labor practices have occurred, and (2) the requested injunctive relief is 'just and proper.'")

The First, Fourth, Seventh, Eighth, and Ninth Circuits interpreted "just and proper" to require the application of the traditional four-factor equitable test for 10(j) injunctions. *See also, Pye on Behalf of N.L.R.B v. Sullivan Bros. Printers, Inc.,* 38 F.3d 58 (1st Cir.1994) "(Two circuits have recently dropped the reasonable cause analysis in section 10(j) cases, reasoning that (1) it was erroneously introduced in section 10(j) cases by analogy to cases arising under section 10(*l*), which, unlike section 10(j), expressly requires that the Regional Director find reasonable cause prior to seeking an injunction,") citing *Miller v. California Pacific Medical Center,* 19 F.3d 449, 456–57 (9th Cir.1994) (en banc); *Kinney v. Pioneer Press,* 881 F.2d 485, 487–93 (7th Cir.1989) (Easterbrook, J.) ("Section 10(j) doesn't tell us what it means to say that relief is 'just and proper/ but we have no doubt that this phrase calls upon the district court to evaluate the propriety of the Director's request with an eye toward the traditional equitable principles that normally guide such an inquiry.").

If *Romero–Barcelo* was not clear enough, perhaps the passing of Winter presents a fresh opportunity to thaw this rigid two-factor test.

## II. *Winter's* Thawing of Injunctive Relief Standards

Even assuming the Third Circuit's interpretation of § 10(j) was appropriate under *Romero–Barcelo,* the Supreme Court's opinion in *Winter* has clarified our equitable landscape.

### a. Facts of *Winter*

In *Winter,* certain environmental organizations were concerned about the effect of the Navy's use of a type of sonar in training exercises on whales in southern California. The groups sought a preliminary injunction alleging violations of various federal laws. The district court granted the injunction. The Ninth Circuit affirmed this finding, even though there was no "evidence that marine mammals have been harmed" by the Navy's exercises, finding a "possibility of irreparable injury." 518 F.3d 658, 696 (9th Cir.2008), The Supreme Court, per Chief Justice Roberts, reversed, and vacated the petition.

The Court identified the four factors a plaintiff must meet when seeking a preliminary injunction.

A plaintiff seeking a preliminary injunction must establish that he is (1) likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter*, at 375 citing *Munaf v. Geren*, 553 U.S. 674, 688–690, 128 S.Ct. 2207, 2218–2219, 171 L.Ed.2d 1 (2008); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

The Supreme Court rejected the Ninth Circuit's standard that granted a preliminary injunction if there was a mere "possibility" of irreparable harm. The *Winter* Court held that irreparable harm must be "likely," not simply possible. The Court wrote, "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, at 374. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 376.

Specifically, the *Winter* Court found that the "Ninth Circuit's 'possibility' standard is too lenient" as "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, at 375. For a Court to issue an injunction on less than a "likelihood" of harm is "inconsistent with [the Court's] characterization of injunctive relief as an *extraordinary remedy* that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *See Winter*, at 375. The Third Circuit's

§ 10(j) standard does not even require a showing of a "possibility" of harm; only a showing of "reasonable cause" that a labor violation occurred. This relatively lenient and deferential standard does not meet *Winter's* more rigorous "likelihood" of irreparably injury requirement.

Further, the Court required that the Ninth Circuit consider the balance of equities and the public interest. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.*, 480 U.S., at 542, 107 S.Ct. 1396. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero–Barcelo*, 456 U.S., at 312, 102 S.Ct. 1798. The Third Circuit standard, other than references to "just and proper" remedies, does not explicitly countenance these two crucial equitable factors.

Following *Winter*, the Supreme Court has reaffirmed the applicability of the four-factor test prior to awarding a preliminary injunction. In *Monsanto v. Geertson Seed Farms*, the Court applied the traditional four-factor test for petitions for injunctions to remedy violations of the National Environmental Policy Act, —— U.S. ——, 130 S.Ct. 2743, 2757, 177 L.Ed.2d 461 (2010) citing *Winter*, at 380–382 ("The traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation."). The Court also noted the district court's "apparent reliance on the incorrect standard set out in the pre-*Winter* Circuit precedents." *Monsanto*, at 2757. Expounding on the appropriate standard for the issuance of a stay, for which there is "substantial overlap" with the "factors governing preliminary injunctions," the Court in *Nken v. Holder*

stressed that the mere "possibility" of harm is "too lenient." 556 U.S. 418, 129 S.Ct. 1749, 1761, 173 L.Ed.2d 550 citing *Winter*, at 375.

### b. Injunctive Relief and *Winter*

After *Winter*, the courts have grappled with the landscape of our injunctive relief jurisprudence. In particular, the validity of the so-called "sliding scale" approach is in somewhat of a state of flux. The reasoning in these cases with respect to the "sliding scale" sheds light on how other equitable tests, including our "reasonable cause test," should fare following *Winter*. *Winter* did not discuss the continuing viability of the "sliding scale", also known as the "serious questions" approach to determine the propriety of a preliminary injunctions. Under this approach, "the [four] elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies,* at 1131. As applied in the Ninth Circuit, "a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.' " *Alliance for the Wild Rockies,* at 1131 quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles,* 340 F.3d 810, 813 (9th Cir.2003).

Justice Ginsburg, in her dissenting opinion in *Winter*, stressing the "[f]lexibility [that] is the hallmark of equity jurisdiction," noted that the "Court has never rejected [the sliding scale] formulation, and I do not believe it does so today." *Winter*, 129 S.Ct. at 391, 392 (Ginsburg, J., dissenting). The Second, Ninth, and Seventh Circuits have reaffirmed the validity of the "sliding scale" test. *See e.g. Citigroup Global Mkts. v. VCG Special,* 598 F.3d 30 (2nd Cir.2010); *American Trucking Associations, Inc. v. City of Los Angeles,* 559 F.3d 1046 (9th Cir.2009). *McDermott v. Ampersand,* 593 F.3d 950 (9th Cir.2010); *Natl. Meat Assoc. v. Brown,* 599 F.3d 1093 (9th Cir.2010); *Alliance for Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir.2011); *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir.2009).

Chief Judge Easterbrook found that the sliding scale test does survive *Winter*, noting that a weaker claim on the merits was still sufficient to warrant a preliminary injunction depending on how much "net harm" could be prevented by the injunction;

> Irreparable injury is not enough to support equitable relief. There also must be a plausible claim on the merits, and the injunction must do more good than harm (which is to say that the 'balance of equities' favors the plaintiff). How strong a claim on the merits is enough depends on the balance of harms; the more net harm an injunction can prevent, the weaker the plaintiffs claim on the merits can be while still supporting some preliminary relief. *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins., Co.,* 582 F.3d 721, 725 (7th Cir.2009) (Easterbrook, C.J.).

The Second Circuit, in even more pointed language, refused to abandon the serious testing approach, finding "no command from the Supreme Court that would foreclose the application of our established "serious questions" standard as a means of assessing a movant's likelihood of success on the merits"

> If the Supreme Court had meant for *Munaf, Winter,* or *Nken* to abrogate the more flexible standard for a preliminary injunction, one would expect some reference to the considerable history of the flexible standards applied in this circuit, seven of our sister circuits, and in the Supreme Court itself … Thus, we hold that our venerable standard for assessing a movant's probability of success on

the merits remains valid. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir.2010).

The District Court for the District of Columbia has also found that the "sliding-scale standard remains viable even in light of the decision in *Winter*." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F.Supp.2d 1, 12 (D.D.C.2009). Dicta from two other circuits suggests that they will continue to adopt a flexible sliding scale approach. *See e.g., RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208–09 n. 3 (10th Cir.2009); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C.Cir. 2009).

The Fourth Circuit, an outlier among post-*Winter* courts, found that the sliding scale approach is now invalid. *Real Truth About Obama, Inc. v. Fed., Election Comm'n*, 575 F.3d 342, 347 (4th Cir.2009) (holding that the circuit's prior test, which permitted "flexible interplay" among the elements, "may no longer be applied" after *Winter*), vacated on other grounds, —— U.S. ——, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010). Two other courts have applied the traditional two-prong standard following *Winter*. *See Glasser v. ADT Security Services, Inc.*, 379 Fed.Appx. 483 (6th Cir. 2010) (unpublished); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844 (5th Cir.2010). However, neither of these cases addressed *Winter*, and merely cited pre-*Winter* precedents.

The "sliding scale" test still considers all four *Winter* factors, even if it applies different weights to each factor. As the Ninth Circuit held, "the 'serious questions' approach survives *Winter* when applied as part of the *four-element Winter test*." *Alliance*, at 1131–1132 (emphasis added). When seeking an injunction, "[o]f course, plaintiffs must also satisfy the other *Winter* factors." *Id.* at 1135. Finally, the Ninth Circuit found that any precedent

that does not consider "all four prongs" are "superseded by *Winter*." *Id.* This Court agrees. Even if the "sliding scale" approach survives *Winter*, a question not before this Court, in light of the reasoning behind these precedents, the two-factor "reasonable cause" approach does not countenance *Winter's* four factors, and therefore can no longer be utilized.

#### c. § 10(j) after *Winter*

Plaintiff disagreed with Defendant's contention that *Winter* "telegraph[ed] to all jurisdictions that they must abandon the use of the two-prong reasonable cause/just and proper standard that has been applied to cases brought under either Section 10(j)." Limiting the discussion of injunctions in *Winter* to the facts of the case, Plaintiff contends that *Winter* did not "implicate application of Section 10(j)" and the "Court did not address the issue of whether ... the two-prong [test or the] four-part traditional equitable test" reflects the appropriate scheme for injunctive relief under the Act.

*McDermott v. Ampersand Publishing, LLC*, was the first circuit court opinion that considered the application of *Winter* to a § 10(j) injunction. The Ninth Circuit found that in order "[t]o decide whether granting a request for interim relief under Section 10(j) is 'just and proper,'" district courts consider the traditional equitable criteria [the four *Winter* factors] used in deciding whether to grant a preliminary injunction. *Ampersand*, at 957 citing *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455, 456 (9th Cir.1994). Under the Ninth Circuit's earlier precedents, "now defunct" following *Winter*, "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction [under § 10(j)] may be entered based only on a 'possibility' of irreparable harm," *Ampersand*, at 957 citing *Scott ex rel NLRB v. Stephen Dunn & Assocs.*, 241

F.3d 652, 661 (9th Cir.2001). "Shunning the more lenient standard adopted by [the Ninth] circuit, the Supreme Court in *Winter* held that a party seeking a preliminary injunction 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.' " *Ampersand*, at 957 citing *Winter*, at 374. "To the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir.2009).

The Ninth Circuit's now "defunct" precedent, requiring a showing of a "possibility" of irreparable harm, is significantly more difficult to satisfy than the Third Circuit's "reasonable cause" standard, Under the Third Circuit's precedents, no showing of harm is required. Rather, merely a showing of "reasonable cause" that a labor violation occurred is sufficient to issue an injunction, if said relief is "just and proper." If the Ninth Circuit's test, which at least considers one of the four *Winter* factors cannot survive, then the "reasonable cause" test likewise cannot survive. While *Ampersand* ultimately applied a more stringent standard in light of First Amendment interests involved in the case, its core holding applying the traditional four-factor test to § 10(j) injunctions is generally applicable to all § 10(j) petitions.

Construed charitably, the Third Circuit's two-factor "reasonable cause" test considers only one of the four *Winter* factors (construed literally it considers none). First, there is no consideration of likelihood of success on the merits—merely a showing of reasonable cause that a labor violation occurred is sufficient. The *Winter* requirement of likelihood of success on the merits is somewhat informed by whether "there is reasonable cause to believe that an unfair labor practice has occurred." The Court is not aiming to "improperly equate[ ] 'likelihood of success' with 'success.' " *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). However, this "low threshold of proof" for "reasonable cause" provides negligible probing into the likelihood of success in demonstrating that an actionable unfair labor practice occurred. The Court cannot simply take the Board's word for it; there must be a greater showing of fact. Second, the Board does not need to make a showing of irreparable harm—certainly a violation of labor law may result in harm to the parties involved, but showing the harm is irreparable, and it is likely to occur, is a much higher threshold. Third, there is no weighing of whether the balance of equities tips in favor of the Defendant—only the Board's interests are considered. Fourth, the "reasonable cause" test does not weigh whether the injunction is in the public interest, rather it only requires the Court to consider whether the relief is "just and proper." Though similar, these standards are not equivalent.

The Court is aware that the *Winter* test makes it more difficult for the Board to seek injunctive relief under § 10(j). Elsewhere, *Sharp v. Parents in Community Action, Inc.*, 172 F.3d 1034, 1038 (8th Cir. 1999), as in this case, the Board argues that requiring a showing of likelihood of success on the merits grants too little deference to the Board's finding of facts, and a "reasonable cause" standard is warranted. Notwithstanding the Board's "primary jurisdiction over labor disputes, [which is] subject only to narrow judicial review," *Ampersand*, at 957, and the fact that the District Court does not have jurisdiction to consider the ultimate merits of unfair labor practice cases, *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491,

502 (7th Cir.2008), the text of § 10(j) does not create such a presumption that the Board is entitled to relief with minimal showings of fact. As the Eighth Circuit noted, "a deferential review of whether the General Counsel had reasonable cause to issue a complaint and seek a preliminary injunction adds little to the analysis of whether a § 100 injunction should issue." *Id.* *See also Pye v. Sullivan Bros. Printers, Inc.,* 38 F.3d 58, 64 n. 7 (1st Cir.1994); *Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 456–59 (9th Cir.1994) (en banc); *Kinney v. Pioneer Press,* 881 F.2d 485, 489–91 (7th Cir.1989). The Court's powers to issue equitable relief "it deems just and proper" under § 10(j) are not premised on a mere showing of "reasonable cause."

Plaintiff expresses concern that if this Court rejects the "reasonable cause" standard, it would "be effectively deciding the merits of an unfair labor practice case without the benefit of the Board's review of facts and legal analysis," and "this is clearly not the statutory scheme contemplated by Congress when it enacted the act." Hardly. The *Winter* standard simply requires that the Board plead their case with additional particularity in order to satisfy each of the four prongs in order to obtain an injunction under § 10(j). A threadbare complaint that fails to accommodate the injunctive quartet, but may exhibit "reasonable cause" of a labor violation, is no longer sufficient under *Winter.* The parties in this case agreed that this court would "hear and decide the Complaint for Injunction Under Section 100 ... on the basis of the record developed before Administrative Law Judge David Goldman in the underlying administrative proceeding, to be supplemented by 'just and proper' evidence" presented to the Court. The ample and detailed findings and legal arguments in the instant complaint, the supporting briefs, and testimony adduced during the hearing satisfy the Court that an injunction for an interim bargaining order shall issue, *see infra.*

A "federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Romero–Barcelo,* 456 U.S., at 313, 102 S.Ct. 1798. Unconstrained by a showing of the four factors, an injunction could be sought where the "case is so thin that not even 'reasonable cause' supports the Board's position." *Kinney,* at 490. Awarding an injunction merely on a showing of "reasonable cause" that a violation of labor law occurred, without any showing of the likelihood of irreparable harm or success on the merits, in the absence of contrary congressional intent is simply inconsistent with the Supreme Court's equitable jurisprudence.

The *Winter* Court painted with a broad brush, noting that the four "factors examined above—[including] the balance of equities and consideration of the public interest—are pertinent in assessing the propriety of *any* injunctive relief, preliminary or permanent." *Winter,* at 380 (emphasis added). Not even Justice Ginsburg's dissent, which labored to protect the "sliding scale" approach, can vindicate the "reasonable cause" test that ignores at least three, and probably all four factors. Reading *Winter* together with *Romero–Barcelo's* prescription that the traditional four-factor equitable test for injunctions applies unless there was a "necessary and inescapable" congressional intent to depart from traditional equitable standards, 456 U.S. at 313, 102 S.Ct. 1798—no such intent is present in § 10(j)—the Court finds that the "reasonable cause" standard should not apply to § 10(j). Rather, the traditional four factors, recognized in *Winter, Romero–Barcelo,* and countless other equitable precedents stretching over centuries of jurisprudence should govern awarding in-

junction relief under § 10(j). Injunctive relief is "just and proper" and shall issue under § 10(j) if the plaintiff is:

> (1) likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter*, at 375 citing *Munaf v. Geren*, 553 U.S. 674, 689–690, 128 S.Ct. 2207, 2218–2219, 171 L.Ed.2d 1 (2008); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

## III. Issues

In its initial Complaint for Injunction under § 10(j) of the National Labor Relations Act, Plaintiff alleged that there was "reasonable cause" to believe that Defendants engaged in unfair labor practices in violation of §§ 8(a)(1), (3), and (5) of the Act, and that injunctive relief is appropriate, just and proper. First, Plaintiff claims that "Defendant Grane and Defendant Cambria Care constitute a single-integrated business enterprise and a single employer within the meaning of the Act." Comp. ¶ 5(d). Further, Plaintiff alleges that "Defendants have continued the employing entity and [are] a successor to Laurel Crest." Comp. ¶ 5(g). According to the Plaintiff, "Defendants have failed and refused to recognize and bargain collectively and in good faith with the Union as the exclusive collective bargaining representative of the Unit at its Cambria Care facility." Comp. ¶ 5(w). Plaintiff asserts that this conduct constitutes a "fail[ure] and refus[al] to bargain collectively and in good faith with the exclusive collective bargaining unit." Comp. ¶ 5(aa).

Additionally, Defendants did not hire two employees, Mark Mulhearn, a Certified Nursing Aide, and Sherry Hagerich, a Unit Clerk, after January 1, 2010. Comp. ¶ 5(x). Plaintiff alleges that the refusal to hire Mr. Mulhearn and Ms. Hagerich is based on the fact that they "formed, joined, and assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities." Comp. ¶ 5(z). Plaintiff asserts that this conduct constitutes "discriminat[ion] in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization in violation of Section 8(a)(1) and (3) of the Act." Comp. ¶ 5(bb).

Based on a concern that Defendants will continue to engage in these alleged violations of the Act, Plaintiff seeks injunctive relief under § 10(j) of the Act to enjoin further transgressions. Comp. ¶¶ 7–9. Plaintiff sought several remedies. First, Plaintiff sought an order directing Defendants to appear before this Court. This order was issued (Document No. 6), and Defendants appeared before this court on 9/28/2010. Second, Plaintiff sought an order directing that the Defendants shall "[i]mmediately recognize and, upon request, meet and bargain in good faith with the Union [Local Union No. 1305, Professional and Public Service Employees of Cambria County a/w the Laborers' International union] regarding the unit employees' [nonprofessional employees employed by Defendants at its Ebensburg, Pennsylvania, facility, including certified nursing aides, housekeeping employees, dietary employees, unit clerks and business office clericals and excluding all other employees, guards, professional employees and supervisors] terms and conditions of employment."

Third, Plaintiff sought an order directing that the Defendants shall "[w]ithin five (5) days of the issuance of the District Court's Decision and Order, offer Sherry

Hagerich and Mark Mulhearn full instatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed, and displacing, if necessary, any workers hired, contracted for, or reassigned to replace them." Fourth, Plaintiff sought an order directing that the Defendants shall "[p]ost copies of the District Court's order at the Defendants' Ebensburg, Pennsylvania facility in all locations where employer notices to employees are customarily posted; maintain those postings during the Board's administrative proceedings free from all obstructions or defacements; and grant to agents of the Regional Director of Region 6 of the Board reasonable access to the Defendants' facility to monitor compliance with this postings requirement." Fifth, Plaintiff sought an order directing that the Defendants shall "[w]ithin twenty (20) days of the issuance of the District Court's order file with the Court, with a copy submitted to the Regional Director of Region 6 of the Board, a sworn affidavit from a responsible official of Defendants setting forth with specificity the manner in which the Defendants have complied with the terms of this order, including the exact locations of the documents required to be posted under this order." Finally, Plaintiff sought that any order issued by this Court include the following language:

This Order shall expire six months from the date of its issuance; provided however, that Plaintiff may, upon motion, request a thirty day extension of this Order if it appears that the decision of the NLRB's administrative law judge on the underlying unfair labor practice complaint in NLRB Cases 6–CA–36791 is imminent; provided further, that after the issuance of said decision of the administrative law judge, upon motion of the Plaintiff, this Order may be extended, exceed six months; provided further,

that Plaintiff may, upon motion, request an additional thirty day extension of this Order, if it appears that the final decision of the NLRB on the underlying unfair labor practice complaint is imminent.

In a separate complaint (Document No. 1) filed under 3:10–cv–244 (subsequently consolidated with 3:10–cv–255), Plaintiff alleged that Defendants engaged in unfair labor practices in violation of Sections 8(a)(1) and (5) of the Act against SEIU Healthcare Pennsylvania, CTW, CLC. Subsequently, Plaintiff filed a motion to withdraw the complaint for injunction under Section 10(j) of the National Labor Relations Act as to the SEIU (Document No. 37). The Court granted this motion (Document No. 39). All previous relief requested against the SEIU is no longer sought. The relief requested in 3:10–CV–225 remains.

■ This District Court sits in an interesting posture. Notwithstanding the lengthy factual record, developed by Administrative Law Judge Goldman, we are not sitting as if we were a Court of Appeals, where we are bound by the record below. In contrast, the Court held lengthy hearings on this matter—at the request of Plaintiff—in which the parties developed new arguments on the merits and appropriate rules of law, and produced witness testimony. Following the hearing, the court requested additional briefing from the parties. The Court does not need to find a clearly erroneous application of law, or an abuse of discretion, in order to depart from Administrative Law Judge Goldman's conclusions. No vertical stare decisis is present here. This administrative record and decision is, at best, characterized as persuasive. For the purposes of Plaintiff's motion, the Court is not bound to follow Administrative Law Judge Goldman's conclusions.

The parties in this case agreed to have this Court "hear and decide the Complaint for Injunction Under Section 10(j) . . . on the basis of the record developed before Administrative Law Judge David Goldman in the underlying administrative proceeding, to be supplemented by 'just and proper' evidence" presented to the Court. When arguments were originally held, Judge Goldman's decision was not yet issued. Only by a coincidence of time in these parallel proceedings was his opinion available for our consideration. Plaintiff originally asked us to decide this matter based on the record in the administrative proceedings, and new evidence proffered. It is on this basis that we resolve the issues before this court.

## IV. Interim Bargaining Order

First, the Court considers whether an interim bargaining order shall issue. Plaintiff claims that Defendants Grane and Cambria Care constitute a single employer, and have continued the operations of its predecessor in interest, Laurel Crest. Because the Defendants have refused to recognize the Laborers' Union, and bargain collectively in good faith with the union, they are in violation of the Act, Plaintiff asserts. Defendants counter that Grane and Cambria Care are not a single employer, and that as a private, rather than public employer, they are not required to negotiate with the Laborers' Union, which represented employees in the predecessor in interest, Laurel Crest.

In order to obtain an injunction under *Winter*, Plaintiff must show (1) a likelihood of success on the merits with respect to showing that Defendants Grane and Cambria Care are a single employer, they continued the operations of Laurel Crest, and they failed to negotiate with the Laborers' Union; (2) the failure to issue an interim bargaining order would cause the plaintiff irreparable harm; (3) the balance of the equities between the Plaintiff and Defendants tips in favor of the Board; and (4) issuing an interim bargaining order is in the public's interest. *Winter*, at 375. The Court finds that these four factors are satisfied, and an interim bargaining order shall issue.

### a. Likelihood of Success on the Merits

Administrative Law Judge Goldman's Decision and Recommended Order informs the Court's analysis for the first *Winter* element. While Plaintiff concedes that Administrative Law Judge Goldman's decision is not "the final administrative decision of the Board," as both parties are taking exception to the decision, the Court still credits its predictive abilities with respect to the likelihood of success on the ultimate merits of the dispute, Accordingly, the Court bases it factual findings and analysis on that decision.

 The Board has found that:
The hallmark of a single employer is the absence of an arms-length relationship among seemingly independent companies. It considers these four factors in deciding single employer status: (I) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. While the Board considers common control of labor relations a significant indication of single-employer status, no single aspect is control, and all four factors need not be present to find single-employer status. Instead, the ultimate determination turns on the liability of the evidence in a given case. (Footnotes and quotation marks omitted.) *Carnival Carting, Inc. and Roman Sanitation, Inc.,* 359 [355] NLRB No. 51, slip op. at 4 (2010); citing *Bolivar–Tees, Inc.,* 349 NLRB 720 [70] (2007) enfd. [*N.L.R.B. v. Bolivar-Tees, Inc.,*] 551 F.3d 772 [722] (8th Cir. 2008).

Considering these four factors, the Court finds that Plaintiff is likely to succeed on the merits with respect to showing that Grane and Cambria Care are in fact a single employer. First, it seems that the operations of Grane and Cambria Care are quite interrelated. The Management Agreement and health care license application intertwine the relationship between Grane and Cambria Care. Grane, through its consultant, controls Cambria Care's daily operations by establishing care practices for residents, as well as training employees. Further, Grane has full access to Cambria Care's checking account and financial records. Second, there continues to be a common management of the facility between Grane and Cambria Care. Grane remains quite active in the daily operation of the facility in a managerial capacity. From the top of the structure, one individual, Len Oddo, the Vice President and COO of Grane and Vice President of Cambria Care, is heavily involved in running both organizations.

Third, Grane effectively has control over the labor relations of Cambria Care, and can establish all initial wages and other terms and conditions of employment, notwithstanding what the Management Agreement purports to do. Lee Oddo, Vice President and COO of Grane, possesses the authority to terminate Owen Larkin, Cambria Care's Administrator, limiting Mr. Larkin's ability to act independently with respect to labor relations. Fourth, the records of Grane and Cambria reflect a commonality of ownership. Even though the bank accounts are separate, individuals who can draw from Grane's account can also draw from Cambria's. Administrative Law Judge Goldman's first conclusion of law was that "Respondents Grane Healthcare Co. and Ebensburg Care Center LLC d/b/a Cambria Care Center (hereinafter referred to collectively as Respondent) are single-integrated enterprises and a single employer, and a

health care institution engaged in commerce within the meaning of Section 2(2), (6), (7), and (14) of the Act." In light of these four factors, the facts alleged in Plaintiff's and Defendant's briefs, facts adduced at the hearing before this Court, as well as the factual findings in Administrative Law Judge David Goldman's thorough opinion, the Court finds that Plaintiff has a strong likelihood of success on the merits to show that Defendant Grane and Defendant Cambria Care are a single employer.

■ A new employer has a duty to bargain with an incumbent union when two factors are satisfied: (1) a continuity of business enterprise exists, and (2) there is a continuity of the workforce. *N.L.R.B. v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Defendants have stipulated to a number of facts that suggest both of these factors are satisfied. First, Defendants stipulated that they have continued to operate the business of their predecessor in interest, the Laurel Crest nursing home in Ebensburg, Pennsylvania. Second, Defendants continued to employ many of the same supervisors employed by Laurel Crest. Third, Defendants service the same patients as Laurel Crest. Fourth, Defendants employed a large number of Laurel Crest's employees. These facts suggest that there is a continuity of business operations between Laurel Crest and Defendants, and there is a continuity of a workforce. Accordingly, the Court finds Plaintiff is likely to succeed on the merits with respect to showing that there is a duty on Defendants to bargain with the incumbent Laborers Union.

Defendants argue that the *Burns* test does not apply because the predecessor was a public employer—which is not covered by the Act—but the Court is not persuaded by this argument. Defendants provide no support for this distinction. To

the contrary, the Board has applied the Burns analysis to cases where the predecessor in interest was a public employee. *See e.g., Lincoln Park Zoological Society,* 322 NLRB 263 (1996) enf'd 116 F.3d 216 (7th Cir.1997).

Administrative Law Judge Goldman's analysis is instructive:

> Given the fact of continuity of operations (successorship) and the fact that a majority of its workforce are former Laurel Crest employees, the question of Respondent's bargaining obligation turns-not at all on whether the predecessor Laurel Crest was a public employer, but-on whether a presumption of majority support by employees for the unions to serve as collective-bargaining representative is applicable to the unions bargaining demands.

> It is the application of this presumption of majority support that is the issue. And under settled principles the Board determines whether the application of majority support applies based on whether a collective-bargaining representative was previously elected or recognized. As the Board has explained, "it is clear from the Supreme Court's opinion in Fall River that the usual presumptions of majority status inherent in Board law apply in successorship situations to ensure stability in collective-bargaining relationships. Such presumptions include those that flow from voluntary or historical recognition and contractual relationships." *Lincoln Park Zoological Society,* 322 NLRB 263, 265 (1996) (citations omitted), enfd. 116 F.3d 216 (7th Cir.1997). Neither law nor logic requires that this original demonstration of majority support have been exhibited under the Act. Board precedent is unequivocal in this regard. 11 Indeed, Respondent's argument has been specifically rejected by the Board. *Lincoln Park Zoological Society, supra;*

*JMM Operational Services, Inc.,* 316 NLRB 6, 11 (1995).

> With regard to the bargaining unit represented by the Laborers, the presumption of majority support is unremarkable, stemming from Laurel Crest's years of recognition of the Laborers as the unit's collective-bargaining representative, and that recognition, in turn, having been based on certification after an election conducted in the unit in which a majority of the employees chose the Laborers as their exclusive collective-bargaining representative. There is no basis in the record to rebut the Laborers presumption of majority support

Based on these precedents, in consideration of Administrative Law Judge Goldman's findings, it seems very likely that Plaintiff will succeed on the merits with respect to showing that there was a continuity of the business enterprise and a continuity of the workforce—and therefore Defendants have a duty to bargain with the incumbent union. *N.L.R.B. v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

### b. Irreparable Harm

■ As the Plaintiff notes, the "the risk of irreparable harm to the discriminatees and to the Laborers' Union's bargaining strength ... continues" prior to the final Board Order. Defendants counter that the empirical evidence introduced at the hearing showed that the Laborers' Union had little support before the sale to Defendants and that post-sale there has been nearly 60% turnover in the workforce. Defendants assert that unions have been and remain able to petition for an election to establish their representational rights. Finally, Defendant argues that there are no facts before this court demonstrating that the Board's ultimate remedial authori-

ty is jeopardized as a result of the normal course of the administrative proceedings.

The Court finds that a failure to issue an interim bargaining order would result in irreparable harm to the Plaintiff. While the employees are free to petition for an election to establish their representational rights, the Court finds that an interim bargaining order—which can contain a condition subsequent that takes into account the possibility of the Board's ultimate refusal to grant a bargaining order remedy—is an appropriate remedy to prevent future irreparable harm from violations of the Act.

### c. Balance of Equities

█ Plaintiff argues that Defendants will suffer relatively little harm if an interim bargaining order is issued. The order would not last forever, and would not compel Defendant to agree to any specific terms or conditions advanced by the Union. Rather, Defendants would only have to bargain in good faith with the Union. In light of the fact that any agreement reached under § 10(j) can contain a condition subsequent to take into account the possibility of the Board's ultimate refusal to grant a bargaining order remedy, the Court finds that the equities tip in favor of the Laborers' Union.

### d. Public interest

█ Plaintiff, relying on the preamble to the Act, asserts that this injunction is clearly in the public interest. Defendants argue that the issuance of a bargaining order is not in the public interest. The Court finds that the public interest weighs in favor of issuing an interim bargaining order. Employees of the incumbent union have a strong interest in insuring that their previous representation by the Laborers' Union is protected. Additionally, Grane and Cambria Care, acting as a single employer, are essentially continuing the operations of Laurel Crest, and ac-

cording to the law, had an obligation to recognize and negotiate with the incumbent union. This interim bargaining order will help protect these public interests.

### V. Instatement of Ms. Hagerich and Mr. Mulhearn

Second, the Court considers whether it should issue an instatement order for Mr. Mulhearn and Ms. Hagerich. Ms. Sherry Hagerich was the Laborers' Local Union President for the last four years of her 20–year employment at Laurel Crest. For the seven preceding years prior to the sale of Laurel Crest, Ms. Hagerich worked as a unit clerk. Mr. Mark Mulhearn worked at Laurel Crest as a nurse's aide. He served as a business manager of the union, and ran the "day-to-day" operations.

From on or about October 27, 2009 to October 30, 2009, Grane collected employment applications from the Laurel Crest employees. Ms. Hagerich and Mr. Mulhearn were not offered employment with Cambria Care to commence on January 1, 2010. Plaintiff contends that there is "reasonable cause" to believe that Defendants refused to offer employment to Ms. Hagerich and Mr. Mulhearn because of their union activities while employed by Laurel Crest, a violation of Section 8(a)(3) of the Act, Defendants counter that these two employees were not hired for legitimate reasons.

In order to obtain an instatement order under *Winter*, Plaintiff must show that (1) they are likely to succeed on the merits with respect to showing that an anti-union animus contributed to the decision not to hire Ms. Hagerich and Mr. Mulhearn; (2) the failure to issue an instatement order would cause an irreparable harm to effective labor relations at Cambria Care; (3) the balance of the equities between the Plaintiff and Defendants tips in favor of the Plaintiff; and (4) issuing an instate-

ment bargaining order is in the public's interest. *Winter,* at 375. Applying the four-factors of the *Winter* framework, the Court finds that an order of instatement is not appropriate.

**i. Likelihood of success on the merits**

 Section 8(a)(3) of the National Labor Relations Act declares it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." See 29 U.S.C. § 158(a)(3). In order to prove a violation of § 8(a)(3), Plaintiff must show that: (1) the respondent was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct; (2) the applicants had experience or training relevant to the announced or generally known requirements of the positions for hire, or in the alternative, that the employer has not adhered uniformly to such requirements, or that the requirements were themselves pretextual or were applied as a pretext for discrimination; and (3) that antiunion animus contributed to the decision not to hire the applicants. See *FES (A Division of Thermo Power) & Plumbers & Pipefitters Local* 520, 331 NLRB 9, 12 (2000). There must be a showing that "antiunion animus was a motivating factor in the decision not to hire, and that there was at least one available opening for the applicant." *Id.* Then, the burden shifts to the employer to show that absent union activity or affiliation, it still would not have hired the applicants.

 The first factor is not in dispute; defendants sought to hire new employees to begin working after January 2, 2010. Second, Hagerich and Mulhearn had been serving in their capacities for some time, and possessed the requisite level of experience and training. This issue is not dispute. This matter hinges on the third prong.

Ms. Beth Lengle is Crane's Vice President of Nursing and was responsible for the decision not to hire Ms. Hagerich and Mr. Mulhearn. Ms. Rebecca Nelen, the former Director of Nursing of Laurel Crest, was in a position to observe the performance of Ms. Hagerich and Mr. Mulhearn in the workplace. The propriety of Defendants' articulated reason for not hiring Ms. Hagerich and Mr. Mulhearn, and whether an anti-union animus contributed to the decision, distills down to a conflict in testimony between, Ms. Lengel and Ms. Nelen. Ms. Lengle testified that she discussed these two individuals with Ms. Nelen, and Ms. Nelen provided her negative information about the applicants that caused her not to offer them employment. Ms. Nelen could not recall whether these conversations took place.

It is instructive to contrast the testimony of Ms. Nelen with the testimony of Ms. Lengle with respect to whether the two discussed Mr. Mulhearn and Ms. Hagerich. Ms. Nelen testified that she knew who Ms. Lengle was, but could not "recall" whether she spoke with Ms. Lengle about the performance of employees at Laurel Crest, Ms. Nelen's answers of "I don't recall" and "I can't say it did or didn't happen," were somewhat equivocal. On further questioning, her answer changed to an even more nebulous "I'm suggesting that I don't recall any specifics in regards to the people in question." After further questioning, she conceded that she "may have had conversations about people" with Ms. Lengle:

Q: As I understand your testimony, you had no substantive conversation with Beth Lengle, about any RN, LPN, or CAN, in terms of work performance.

A: I don't recall having.

Q: All right. I appreciate that it was a while ago.

A: It was a long time ago.

Q: So when you say you don't recall, you are not saying it didn't happen?

A: I can't say it did or didn't happen.

Q: Okay.

A: Or that something wasn't said in passing. But—or something wasn't overheard.

Q: Okay.

A: But I don't recall.

. . .

Q: Are you suggesting that Beth Lingle didn't talk to you at all about any registered nurse, licensed practical nurse, or certified nurse aide, during the course of Grane's seeking to employ the employees at Laurel Crest?

A: I'm suggesting that I don't recall any specifics in regards to the people in question.

Q: Well, that's a different answer. That's an answer to a different question. Do you know whether she asked you about anyone?

A: We may have had conversations about people. I really don't remember details. There were a lot of people in an out, at that time, and 1 was having to provide a lot of information to a lot of people, so—

Q: Nevertheless, do you recognize Beth Lengle?

A: Sure.

Q: And I assume you had some interaction with Beth during the course of the negotiation process between Grane and the county?

A: Sure.

Transcript, Vol. I pp. 172–175.

Ms. Lengle's testimony corroborates Ms. Nelen's somewhat-hazy recollection that the two had conversations about the performance of certain employees:

Q: Did you have a series of sit down meetings with the director of nursing, to determine who were the best nurses, and who were not?

A: 1 sat down with Ms. Nelen, and went through all potential applicants, for reference.

Q: On how many occasions did you sit down with her, and do that?

A: As many as it took to get through every applicant.

Q: And how—I'm sorry?

A: As many as it took to get through every applicant there was.

Q: And how many was that?

A: I don't remember. She would get interrupted to do other duties, and I would get interrupted to do other things I needed to do complete my tasks.

Q: Okay.

A: So as many as it took to get whatever applicants.

Transcript, Vol. II p. 240.

Ms. Lengle testified, clearly and unequivocally, that she met with Ms. Nelen. None of Ms. Nelen's testimony rebuts Ms. Lengle's testimony that she spoke with Ms. Nelen. Ms. Nelen could not recall whether she had any discussions about Ms. Hagerich and Mr. Mulheam with Ms. Lengle—but, notably, she did not deny it.

Second, it seems that the pair interacted somewhat frequently. Ms. Nelen acknowledges there was "some interaction" with Ms. Lengle. Ms. Lengle's testimony confirms this, noting that they met between one and ten times:

Q: So it sounds like there might have been quite a few meetings between you and Mrs. Nelen, about these prospective applicants; is that correct; if you are both being interrupted?

A: More than one.

Q: Well, there was more than one. How about more than ten?

A: No.

Q: How about more than five?

A: I don't know.

Q: How about more than six?

A: I don't know.

Q: Do you have a recollection of these meetings?

A: I have a recollection of the meetings, I do not know how many meetings occurred.

Q: But you certainly know that there were more than one?

A: Yes, I do.

Q: And I'm trying to refresh your recollection.

A: Less than ten, more than one.

Q: Right, that's the best you can do.

A: Yes, it is.

Transcript, Vol. II pp. 240–243.

Ms. Nelen and Ms. Lengle seem to disagree about whether they discussed Ms. Mulhearn. Ms. Lengle testified that she relied on Ms. Nelen's comments about Mr. Mulhearn—including poor performance and attendance problems'—in deciding not to hire Mr. Mulhearn. Ms. Lengle did not view any of Mr. Mulhearn's personnel files, and was not aware of documented attendance problems.

Q: And it was you who made the decision not to hire Mark Mulhearn?

A: Yes, it was.

Q: And you based the decision not to hire Mark Mulhearn on information you received from Rebeca Nelen; correct?

A: Correct.

Q: And according to you, Rebecca Nelen told you that Mulhearn had bad performance, or poor performance, and attendance problems; is that correct?

A: Yes, that's correct.

. . .

Q: You were also informed that at least Mark Mulhearn's work performance and attendance was well documented; correct? That he had documented poor performance problems?

A: No, I don't recall that.

Q: You did not review any of the personal files; is that correct?

A: That is correct, I did not.

Q: You were in the facility for how long, during this hiring process?

A: During the hiring process? Approximately six, eight weeks.

Q: And the personnel files were located there; right?

A: Yes, they were.

Q. So you couldn't have easily gone to look at them; correct?

A: No, I couldn't.

Transcript, Vol. II pp. 226–228,

Ms. Nelen's couched answer, "I don't specifically recall him, no" is somewhat in conflict with Ms. Lengle's testimony.

Ms. Nelen seems to concede that she had a somewhat-negative opinion of Ms. Hagerich, and she "could have said something" about nursing staff on the First Floor-which included Ms. Hagerich.

Q: Does it refresh your recollection, if I suggest to you that you had a conversation with Beth Lengle to this effect: "Beth, in respect to the nursing staff on the first floor, you got to blow it up, and start over again."

A: No, I don't remember. I don't remember.

Q: You don't remember saying that?

A: Okay. This is a very, very long time ago, so to expect me to remember a detailed conversation of exact words, I have no idea. I have no idea.

Q: You just don't recall?

A: I could have said something about first floor. First floor was difficult.

Q: Precisely. I mean, it was no secret, was it, that the nursing staff on the First floor were difficult people?

A: No, it was not a secret.

Q: And included Mr. Billy?

A: Yes, he was on the first floor.

Q: Did that include Mr. Mulhearn?

A: No, he was not on first floor.

Q: Did that include Ms. Hagerich?

A: She was also on first floor?

Q: So, okay. We know at least that some of the nursing staff on the first floor were difficult employees?

A: Uh-huh.

Q: And, they were difficult for a variety of reasons, 1 assume?

A: Uh-huh.

. . .

Q: And, Miss Hagerich was one of those people who were difficult.

A: I don't know that she was necessarily difficult.

Q: Okay. When you say "necessarily difficult," that leads me to believe, "Well, was she unnecessarily"—I mean, was it a matter of degree, was she more difficult than people who weren't difficult at all?

A: I don't know that I can categorize it that way.

Transcript, Vol. I p. 179.

Ms. Lengle's testimony supports Ms. Nelen's testimony. She spoke with Ms. Nelen about Ms. Hagerich, and learned that she was somewhat difficult-whether "necessarily difficult" or not.

Q: You also decided not to hire, and responsible for the decision not to hire Sherry Hagerich; is that correct?

A: That's correct.

Q: And you based your decision not to hire Sherry Hagerich on Nelen's advice as well; correct?

A: On her reference.

Q: On her reference. And that specifically was that Hagerich's attendance was poor?

A: I believe it was more than just her attendance.

Q: In addition to attendance, Nelen told you that Hagerich was loud, obnox-ious, and caused trouble amongst her co-wokers; is that correct?

A: Yes.

Transcript, Vol. II pp. 226–227,

A reasonable reading of this record suggests that Ms. Nelen and Ms. Lengle had conversations about Ms. Hagerich and Mr. Mulhearn. Ms. Nelen, who was quite busy and overworked at the time—frequently their interactions would "get interrupted to do other duties"—could not recall these conversations.

Beyond these somewhat conflicting testimonies, at issue are the performance evaluations of Ms. Hagerich and Mr. Mulhearn. At the time the employment decisions were made, Ms. Lengle did not review the personnel files. Thus, these pieces of evidence are noteworthy as ex post evidence to support the Defendants' assertion that the decision not to hire Ms. Hagerich and Mr. Mulhearn were based on legitimate reasons, and not an anti-union animus. Ms. Hagerich's 2004–05 evaluation rated her as "commendable," and noted that she is "overpowering [and] at times abrupt" and that "other disciplines have commented negatively." Ms. Hagerich's 2005–06 evaluation indicated that Ms. Hagerich "could improve on her interpersonal relations" and "at times she comes across as being abrupt." Ms. Hagerich's October 2, 2009 evaluations rated her as "satisfactory," and she received favorable comments from several Registered Nurses. Plaintiff asserts that these mixed comments do not translate to "loud, obnoxious and causing trouble amongst her co-workers." Plaintiff further asserts that there is no evidence to support claims that Ms. Hagerich had poor attendance.

Plaintiff cites to several "commendable" performance evaluations for Mr. Mulhearn for 2009, 2008, 2007, and 2002, an "outstanding" evaluation from 2005, and a "satisfactory" evaluation from 2004. Defen-

dants cite Mr. Mulhearn's periodic refusal to work mandatory overtime, for which he received a disciplinary action in 2007. Ms. Lengle was unaware of this disciplinary action at the time she made her decision not to offer him employment.

Beyond the performance records of Ms. Hagerich and Mr. Mulhearn, Plaintiff cites other "circumstantial evidence that Defendants unlawfully refused to hire Hagerich and Mulhearn of the kind that the Board has traditionally relied upon to support findings of unlawful discrimination," The Plaintiff argues that evidence of antiunion animus can be derived from circumstantial evidence; evidence that an employer's asserted justification is no more than a sham or pretext. *Wright Line, Inc.*, 251 NLRB 1083, 1084 (1980) enfd. on other grounds 662 F.2d 899 (1st Cir.1981). The Plaintiff asserts that the "disproportionate impact upon the Laborers' Union governing body by the Defendants' refusal to hire Hagerich, Mulhearn, and other union officers, constitutes strong evidence of unlawful discrimination."

During the hearing, Mr. Larkin testified that after January 1, 2010, the turnover rate at Cambria Care was 111% for registered nurses, 47% for licensed practical nurses, 25% for unit clerks, 80% for nurses aides, 40% for dietary personnel, and 58.35% overall. Defendants argue that the failure to hire these two employees, and the high turnover rate in general, is not attributable to any unfair labor practice. Further, a number of officials who openly identified and supported the union were hired by Cambria Care, Lee McIntosh, a "long-time" shop steward is still employed by Cambria Care Center. In addition, Ms. Mary Reese, Ms. Lisa McIntosh, Ms. Bev Bertram, who all openly identified with the union, currently work for Cambria Care. Transcript pp. 85–86.

Plaintiff claims that Defendants' assertion that they did not know Mr. Mulhearn

was a union official is not "credible," and the refusal to hire Mulhearn is pretextual. Plaintiff asserts that Ms. Hagerich and Mr. Mulhearn engaged in informational picketing outside the County Commissioners' office in order to place pressure on the County to ensure that Grane would honor certain labor relations of employees at Laurel Crest. Ms. Hagerich and Mr. Mulhearn appeared in local newspaper and television reports. The simple fact that these individuals were prominently featured in media accounts does not *ipso facto* translate to Ms. Lengle's awareness. Ms. Lengle, commenting on Mr. Billy, another union official who was not hired, remarked that she did not know he was a union official.

Q: You knew that he [Mr. Billy] was a union official; is that correct?

A: No, I did not.

Q: You didn't know that?

A: No.

Q: Miss Nelen didn't tell you that?

A: No, she didn't

Transcript, Vol. II p. 231.

It stands to reason that if Ms. Lengle was not aware of the union affiliation of Mr. Billy, she may not have been aware that Ms. Hagerich and Mr. Mulhearn were union leaders.

Based on the preceding analysis, the Court cannot conclude that an antiunion animus contributed to the decision not to hire the applicants. See *FES (A Division of Thermo Power) & Plumbers & Pipefitters Local* 520, 331 NLRB 9, 12 (2000). There are certainly some conflicts between the testimony of Ms. Nelen and Ms. Lengle, as can be expected for events that took place some time ago. Yet, the number of areas of agreement where Ms. Nelen's hazy recollection and Ms. Lengle's memory overlap suggests that Ms. Lengle did consult with Ms. Nelen, as she testi-

fied, and learned certain items about Ms. Hagerich and Mr. Mulhearn that led her to decide not to offer them employment. Even with a less-than-certain record, there is no direct evidence that any antiunion animus contributed to this decision. The additional circumstantial evidence that Plaintiff adduces is insufficient to make the requisite showing. With this tenuous case, the Court finds that Plaintiff has not established a likelihood of success on the merits.

### ii. Irreparable Harm

 This action was not brought on behalf of Ms. Hagerich and Mr. Mulhearn to remedy individual violations of their rights. Indeed, Mr. Mulhearn testified that he has obtained other employment with the Commonwealth of Pennsylvania, and is not even sure if he would want instatement:

Q. Okay. As I review it, it contains seven paragraphs that covers a variety of subjects. I just have a question about Paragraph 5. In that affidavit you indicate that you do not at the present time want to go back to work at Cambria Care Center.

A. That's correct.

Q. You changed your mind?

A. I—yes, I did change my mind. I just—I don't want to close any doors.

Q. Well, you indicated in your affidavit that because you went to work for the Commonwealth—I assume you mean Pennsylvania?

A. Correct.

Q. —you don't at the present time want to go back to work at the facility. You're making more money, "receiving better wages in my new job than I had while employed by the County."

A. Correct.

Q. Is that what you told us?

A. Correct.

Q. Okay. So are you still employed by the Commonwealth?

A. Yes, I am.

Q. So you might want restatement; you're not sure?

A. Correct.

Hearing on October 4, 2010, Transcript pp., 58–59.

Rather, this action was brought by Plaintiff on behalf of the Regional Director to seek injunctive relief for the violation of the Act. Plaintiff, citing to the preamble to the Act, contends that the purpose of the Act is to protect and promote the free flow of commerce and protect employees collective-bargaining rights. In this case, the alleged irreparable harm is not the alleged continuing injuries suffered by Ms. Hagerich and Mr. Mulhearn as a result of Defendants' actions. Plaintiff seeks the instatement of Ms. Hagerich and Mr. Mulhearn not out of a motivation to provide these individuals with employment. Rather, Plaintiff seeks the instatement of these employees to ensure that the union has a viable presence in the workplace to represent the interests of the other workers. The alleged irreparable harm in this case is further violations of the Act by Defendants. Instatement of these two individuals is intended to provide the workers with suitable representation during bargaining.

While the Court does not doubt that the inclusion of these two long-standing union officials would increase the union presence in the workforce, the absence of these individuals would not yield irreparable harm in light of the Court's injunctive relief. The Court will order Defendants to "recognize and, upon request, meet and bargain in good faith with the Union." A copy of that order will be posted in the Defendant's facility. The Court finds that these steps are sufficient in order to prevent further irreparable harm to the negotiations between the Union and the Defendants. In light of the fact that other union officials—including Lee McIntosh, a "long-

time" shop steward still employed by Cambria Care Center, Lisa Charney, Roger Brown, Mary Reese and Bev Bertram—were hired after January 2, 2010, the ordering of the instatement of Ms. Hagerich and Mr. Mulhearn is not appropriate.

### iii. Balance of Equities

▉ Plaintiff asserts that Defendants will incur little harm by offering instatement to Ms. Hagerich and Mr. Hulhearn, only two employees, in a total workforce of about 300. Defendants contend that the equities do not favor a ruling for Plaintiff, in that the Board does not consider the importance of regular employee turnover, *Cogburn Health Center, Inc. v. N.L.R.B.*, 437 F.3d 1266, 1274 (D.C.Cir.2006) (quoting *Douglas Foods Corp. v. N.L.R.B.*, 251 F.3d 1056, 1066 (D.C.Cir.2001)) (The Board "is not free to disregard employee turnover when issuing a bargaining order."). The Court finds that the equities do not tip in favor of an instatement order. As the analysis regarding irreparable harm shows, the desired result—preventing further violations of the Act—can be remedied with the interim bargaining order, Instatement is not an appropriate form of relief.

### iv. Public interest

▉ The distinction between *Winter* and the two-factor "reasonable cause" test is perhaps most pronounced in the consideration of the public interest. The reasonable cause test only considers the interests the Board asserts,[3] rather than the broader public interest traditionally weighed in equitable injunction cases. Plaintiff claims that even if Defendants would have to displace current employees to instate Ms.

Hagerich and Mr. Mulhearn, "this is not a sufficient reason to overcome the public interest in preserving the Board's ability to effectuate a remedy." The Plaintiffs brief is pointedly not concerned with the public interest; it is concerned with the "the Board's ability to effectuate a remedy." There is no concern about the interests of Defendants, society as a whole, and the propriety of the Court micromanaging employment decisions of whom to hire, in the absence of any discernible anti-union animus. The free flow of commerce and collective bargaining rights of employees, protected by the Act, can be guaranteed by the interim bargaining order issued. Instatement is beyond the necessary scope of relief as demanded by the public interest.

\* \* \*

An order in accordance with this Memorandum shall issue.

▉

---

3. *Vibra Screw*, 904 F.2d at 878–79 ("Because the 'just and proper' inquiry must recognize the *public interest in protecting the collective bargaining process*, the critical determination is whether, absent and injunction, the Board's ability to facilitate peaceful management-la-

bor negotiation will be impaired.") (emphasis added).