**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-2573 & 11-2978
_____

ROBERT W. CHESTER,
Regional Director of the National Labor Relations Board for
Region Six,
for and on behalf of the National Labor Relations Board

v.

GRANE HEALTHCARE CO., and/or
EBENSBURG CARE CENTER, LLC, d/b/a CAMBRIA
CARE CENTER, Single Employer

Grane Healthcare Co., and/or Ebensburg Care Center,
LLC,d/b/a Cambria Care Center, Single Employer,
                                    Appellant in No. 11-2573

Robert W. Chester,
                                    Appellant in No. 11-2978
_____
On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Nos. 3-10-cv_00225 and 3:10-cv-00244)
District Judge: Hon. Kim R. Gibson
_____

Argued September 21, 2011

Before: AMBRO, CHAGARES and VANASKIE, *Circuit Judges*

(Filed: December 7, 2011)

Richard J. Antonelli, Esq. (*Argued*)
Rebecca J. Dick-Hurwitz, Esq.
John A. McCreary, Jr., Esq.
Babst, Calland, Clements & Zomnir
Two Gateway Center
6th Floor
Pittsburgh, PA 15222

        *Counsel for Appellants & Cross-Appellees*
        *Grane Health Care and/or Ebensburg Care*
        *Center, LLC*

Judith I. Katz, Esq.
Steven L. Sokolow, Esq.
Laura T. Vazquez, Esq. (*Argued*)
National Labor Relations Board
Division of Advice, Injunction Litigation Branch
1099 14th Street, N.W.
Washington, D.C. 20570

        *Counsel for Appellee & Cross-Appellant Robert*
        *W. Chester*

_____

OPINION
_____

VANASKIE, *Circuit Judge*.

This matter comes before us on cross-appeals from the District Court's ruling on a petition for interim injunctive relief sought by the National Labor Relations Board ("NLRB") pursuant to § 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(j). For nearly forty years, since *Eisenberg ex rel. N.L.R.B. v. Hartz Mountain Corp.*, 519 F.2d 138 (3d Cir. 1975), we have held that to award interim injunctive relief under § 10(j) "a federal district court must merely find 'reasonable cause' to believe an unfair labor practice has occurred and must determine that the relief sought is 'just and proper.'" *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1078 (3d Cir. 1984). The District Court in this case, following a thoughtful discussion of pertinent precedents, determined that our two-prong approach was inconsistent with pronouncements of the Supreme Court dating back nearly thirty years, to *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982). *See Chester ex rel. N.L.R.B. v. Grane Health Care Co.*, ___ F. Supp. 2d ____, 2011 WL 2517037, at *5-14 (W.D. Pa. June 2, 2011). Applying the familiar four-factor test applicable to generic preliminary injunction motions—likelihood of success on the merits; imminent threat of irreparable harm; balance of equities favoring interim injunctive relief; and the public interest being served by the interim relief—the District Court granted the requested interim bargaining order but denied the requested interim hiring of several aggrieved individuals. Having carefully considered the matter, we conclude that the Supreme Court decisions upon which the District Court

3

relied, having arisen in completely different contexts and involving statutory schemes unrelated to the NLRA, do not warrant abrogation of our two-prong approach to § 10(j) petitions. Furthermore, we will affirm the interim bargaining order issued by the District Court, as plainly compelled under the two-prong approach. As to the requested interim hiring orders, however, we believe that the District Court should, in the first instance, determine whether such relief is appropriate under our two-prong approach.

## I.    Facts and Proceedings

Prior to January 1, 2010, Cambria County, Pennsylvania owned and operated Laurel Crest Nursing and Rehabilitation Center ("Laurel Crest"), a facility located in Ebensburg, Pennsylvania. All of the employees of Laurel Crest were employed by Cambria County, who as a public employer was subject to the Pennsylvania State Public Employee Relations Act ("PERA"), 43 P.S. § 1101.301(1). Since its certification in 1971 by the Pennsylvania Labor Relations Board, the Professional and Public Service Employees of Cambria County a/w Laborers' District Council of Western Pennsylvania, Local 1305 ("Local 1305") was the collective-bargaining representative of a unit of non-professional employees employed by Cambria County at Laurel Crest. Cambria County recognized Local 1305 as the exclusive bargaining representative of the unit, and entered into a series of collective-bargaining agreements with Local 1305, the most recent of which ended in December, 2008.

In September, 2009, Appellant Grane Healthcare Co. ("Grane"), a private entity that owns and manages several Pennsylvania nursing facilities, entered into an asset purchase

4

agreement with Cambria County to purchase Laurel Crest. On January 1, 2010, the purchase became final, and Grane assumed operations of Laurel Crest.[1] In December, 2009, Grane officials conducted the initial hiring, and retained most, but not all, of the individuals who had been employed at Laurel Crest by Cambria County and who applied to be hired by Grane. Among the former Laurel Crest employees not hired by Grane were several Local 1305 officers, including Sherry Hagerich, who was the Local 1305 president, and Mark Mulhearn, who was a business manager of Local 1305.

In December, 2009, in anticipation of the impending sale, Local 1305 requested by email that Grane recognize Local 1305 as the exclusive collective-bargaining representative of the nonprofessional employees at Laurel Crest. By letter dated January 11, 2010, Grane refused the Local 1305 request. Local 1305 then filed an unfair labor practice charge with the Board.

In May, 2010, following an investigation of the charge, the Board's General Counsel, through Robert W. Chester, the Acting Regional Director of Region 6 ("Director"), issued a complaint and notice of hearing against Grane, asserting multiple unfair labor practices in violation of § 8(a)(1), (3), and (5) of the NLRA, 29 U.S.C. § 158(a)(1), (3), and (5).

-----

[1] When Grane Healthcare Co. acquired Laurel Crest, it established a new entity, Ebensburg Care Center, LLC d/b/a Cambria Care Center, to manage it. In the District Court, the parties disputed whether the two qualified as a "single employer" under the NLRA. Since the single employer question is not at issue here, Appellants are referred to collectively as "Grane."

The complaint contended, *inter alia*, that: (1) Grane's refusal to recognize and bargain with Local 1305 as the collective-bargaining representative of a bargaining unit of employees was a violation of § 8(a)(1) and (5) of the Act; and (2) Grane's failure to hire certain applicants, including Mark Mulhearn and Sherry Hagerich, was a violation of § 8(a)(1) and (3) of the Act.[2] Grane denied all of the alleged violations of the Act.[3] In July and August of 2010, Administrative Law Judge David I. Goldman ("ALJ Goldman") conducted hearings on the unfair labor practice charges.

On August 26, 2010, the Director petitioned the District Court for temporary injunctive relief pursuant to § 10(j) of the Act. The Director requested, in pertinent part, that the judge order Grane to: (1) recognize and bargain in good faith with Local 1305; and (2) reinstate Hagerich and Mulhearn.

---

[2] The complaint also alleged that Grane and Cambria Care constituted a single employer under the Act, and listed three applicants in addition to Mulhearn and Hagerich whom Grane also allegedly refused to hire in violation of the Act. Since neither the single employer issue nor the instatement of the other three applicants is raised on appeal, we do not address those issues here.

[3] In January and April, 2010, SEIU Healthcare Pennsylvania, CTW, CLC ("SEIU") also filed unfair labor practice charges against Grane. In July, 2010, the Director filed a second complaint against Grane based on the SEIU charges. The Director subsequently consolidated the two complaints.

The District Court decided the petition on the basis of the record developed by ALJ Goldman in the administrative proceeding below—including the testimony and exhibits produced at the hearings as well as the parties' factual stipulations—supplemented by testimony and arguments adduced at an evidentiary hearing the District Court conducted. In December, 2010, well before the Court ruled on the § 10(j) petition, ALJ Goldman issued his decision in the administrative proceedings.[4] The District Court observed that it was "not bound to follow [ALJ] Goldman's conclusions," and explained that "[t]his administrative record and decision is, at best, characterized as persuasive." *Chester*, 2011 WL 2517037 at \*16. Applying the four-factor test governing preliminary injunction motions, the District Court granted the interim bargaining order but denied the interim instatement of Hagerich and Mulhearn.

Both parties now appeal. Grane appeals the temporary bargaining order, contending that the District Court committed error in concluding that the four-factor test was satisfied. The Director cross-appeals on two grounds. First, he contends that the District Court erred by rejecting our established two-part test and applying the four-part test instead. Second, he argues that the § 10(j) petition qualified for injunctive relief under either the two-part or four-part test, and that the District Court therefore erred by declining to grant the interim instatement order.

---

[4]ALJ Goldman held, *inter alia*, that Grane violated § 8(a)(1) and (5) of the Act by refusing to recognize and bargain with Local 1305, and that it violated § 8(a)(1) and (3) by refusing to hire Mulhearn and Hagerich.

7

## II.     Standard for §10 (j) Injunctive Relief

### A.

We begin our analysis by addressing the threshold issue of whether the District Court erred in concluding that Supreme Court precedent vitiates our established two-part test for § 10(j) relief.  "The issue of whether a district court applied the correct legal standard is a legal question, which this Court reviews *de novo*."  *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 234 (6th Cir. 2003).

### B.

Congress vested primary jurisdiction over the elaboration of labor policy and the adjudication of labor disputes in the NLRB.  *See, e.g., N.L.R.B. v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 96 (1957) ("The function of striking [the] balance [between conflicting legitimate interests] to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review."); *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 194 (1941) ("The exercise of the process [of administering the Act] was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.").  The NLRA provides for the adjudication of alleged unfair labor practices through an administrative process that involves initial fact-finding and

determination of the charges by an ALJ, whose decision is reviewable *de novo* by the Board. The Act vests Courts of Appeals—and in certain circumstances the District Courts—with judicial review of final Board decisions under a standard that requires considerable deference to various Board determinations. *See* 29 U.S.C. §§ 160(e), (f).

As originally enacted in 1935, the NLRA did not include any provision authorizing the Board to seek to enjoin alleged unfair labor practices pending adjudication of charges by the Board.[5] Thus, unfair labor practices—by both unions and employers—could persist while administrative processes were pursued. Congress sought to remedy this problem in the Taft-Hartley Act of 1947 by mandating that the Board seek interim injunctive relief in an appropriate district court for certain enumerated unfair labor practices by unions, such as secondary boycotts, jurisdictional strikes and hot cargo contracts, *see* 29 U.S.C. § 160(*l*), and by authorizing, but not requiring, the Board to seek interim injunctive relief for other unfair labor practices. *See* 29 U.S.C. § 160(j). Specifically § 10(j), added in 1947, provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this

[5] The Board was only authorized to seek enforcement of its final orders by petitioning the appropriate federal court of appeals. *See* 29 U.S.C. § 160(e). The Board could seek "appropriate temporary relief or restraining order," and the court could award such relief "as it deems just and proper." *Id.* Similarly, when an aggrieved party sought review of a final Board order in an appropriate court of appeals, the court could "grant to the Board such temporary relief or restraining order as it deems just and proper . . . ." 29 U.S.C. § 160(f).

9

section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j). The Senate Report on the bill that became §10(j) explains the purposes of this section and the concerns that motivated it as follows:

[T]he committee is convinced that additional procedures must be made available under the National Labor Relations Act in order adequately to protect the public welfare . . . Time is usually of the essence in [§ 10(j) cases], and consequently the relatively slow procedure of the Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objectives of the free flow of commerce and encouragement of the practice and procedure of free private collective bargaining. Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair

10

labor practices . . . .  Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearing and litigation enforcing its order, the Board had not been able in some instances to correct unfair labor practices until after some substantial injury has been done . . . .  [I]t has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation.

S. Rep. No. 105, at 8, 27 (1947).

In addressing "for the first time the proper application of Section 10(j)" in *Hartz Mountain Corp.*, 519 F.2d at 140, we found guidance in *Schauffler v. Highway Truck Drivers & Helpers, Local 107*, 230 F.2d 7 (3d Cir. 1956).  In *Schauffler*, we held that to warrant § 10(*l*) relief, a district court must "find that there is reasonable cause to believe that a violation of the [NLRA] as charged has been committed," *id.* at 9, and that "a proper exercise of judicial discretion" warrants interim injunctive relief.  *Id.*  In *Hartz Mountain*, we adopted the same two part approach for § 10(j) petitions—"reasonable cause" to believe that the alleged unfair labor practice was committed and relief that is "just and proper," stressing that deciding what relief, if any, was "just and proper" would be of "critical importance when relief is sought under Section 10(j) . . . ."  *Hartz Mountain*, 519 F.2d at 141.

Since *Hartz Mountain*, we have consistently adhered to the two-prong standard, *see, e.g., Eisenberg ex rel.*

11

*N.L.R.B. v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 905 (3d Cir. 1981); *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247 (3d Cir. 1998), elaborating on the "reasonable cause" prong in *Suburban Lines*, 731 F.2d at 1083-84, and the "just and proper" prong in *Pascarell ex rel. N.L.R.B. v. Vibra Screw Inc.*, 904 F.2d 874, 878-79 (3d Cir. 1990). We are joined by the Fifth, Sixth, Tenth and Eleventh Circuits in applying this two-part test to § 10(j) petitions. *See Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 850 (5th Cir. 2010) (upholding its "sequential, two-part[] inquiry" for § 10(j) injunctive relief); *Ahearn*, 351 F.3d at 237 ("The prevailing standard district courts in the Sixth Circuit employ when considering a § 10(j) petition is the 'reasonable cause/just and proper' standard."); *Sharp ex rel. N.L.R.B. v. Webco Industries, Inc.*, 225 F.3d 1130, 1133 (10th Cir. 2000) (recognizing the two-part test as the standard for district courts in that circuit to apply to grant § 10(j) relief); *Arlook ex rel. N.L.R.B. v. S. Lichtenberg & Co.*, 952 F.2d 367, 371 (11th Cir. 1992) (same).

Other courts of appeals, including the Fourth, Seventh, Eighth, and Ninth, have rejected the two-part approach, and interpret § 10(j)'s just and proper clause as requiring the traditional four-factor equitable framework that courts apply to grant preliminary injunctions pursuant to Federal Rule of Civil Procedure 65(a). *See, e.g.*, *Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, 570 F.3d 534, 542 (4th Cir. 2009); *Kinney v. Pioneer Press*, 881 F.2d 485, 490, n.3 (7th Cir. 1989); *Sharp v. Parents in Cmty. Action, Inc.*, 172 F.3d 1034, 1037 (8th Cir. 1999); *Miller v. California Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994) (en banc). The First and Second Circuits apply a hybrid standard: they apply the two-prong, "reasonable cause/just and proper" test, but expressly

incorporate the four equitable criteria into the "just and proper" prong. *See, e.g., Pye ex rel. N.L.R.B. v. Sullivan Bros. Printers, Inc.*, 38 F.3d 58, 63 (1st Cir. 1994) (When deciding whether "injunctive relief is just and proper . . . the district court must apply the familiar, four-part test for granting preliminary relief.")[6]; *Hoffman v. Inn Credible Caterers, Ltd.,* 247 F.3d 360, 368 (2d Cir. 2001) ("In this Circuit, injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo. While this standard preserves the traditional equitable principles governing injunctive relief, we are mindful to apply them in the context of federal labor laws.") (citations omitted).

## C.

Under our Internal Operating Procedures, a panel of this Court cannot overrule an earlier binding panel decision; only the entire court sitting en banc can do so. *See* Third Circuit I.O.P. 9.1.[7] However, "a panel of our Court may decline to follow a prior decision of our Court without the

---

[6] Contrary to the District Court's suggestion, the First Circuit in *Sullivan Bros.* did not drop its "reasonable cause" prong. Although noting that this inquiry is of "questionable utility," the First Circuit declined to address its applicability because the parties did not challenge it. *Sullivan Bros.*, 38 F.3d at 64 n.7.

[7] "It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so." Third Circuit I.O.P 9.1.

necessity of an en banc decision when the prior decision conflicts with a Supreme Court decision." *United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009). *See also United States v. Singletary*, 268 F.3d 196, 202 (3d Cir. 2001) ("[O]ur respect for the uniformity of decisions within this Court yields when a prior panel's holding conflicts with a holding of the Supreme Court."); *Planned Parenthood of S.E. Pa. v. Casey*, 947 F.2d 682, 698 (3d Cir. 1991), *aff'd in part, rev'd in part*, 505 U.S. 833 (1992) ("[A] change [by the Supreme Court] in the legal test or standard governing a particular area is a change binding on lower courts that makes results reached under a repudiated legal standard no longer binding."); *Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858 (3d Cir. 1996); *Cox v. Dravo Corp.*, 517 F.2d 620, 627 (3d Cir. 1975) ("We should not countenance the continued application in this circuit of a rule, even of our own devising, which is patently inconsistent with the Supreme Court's pronouncements.").

The District Court concluded that the Supreme Court's decisions in *Romero-Barcelo* and *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), require application of the traditional four-part equitable test. In *Romero-Barcelo*, the Governor of Puerto Rico and residents of the island sought to enjoin the Navy's use of an island off the Puerto Rican coast for weapons training exercises, claiming that the occasional discharge of weapons harmed the water quality, and that because the Navy had not obtained a permit, its conduct violated the permit requirements of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251, *et seq*. *See* 456 U.S. at 307. The First Circuit held that the FWPCA requires a district court to immediately enjoin conduct in violation of the permit requirements and

14

thereby preclude the exercise of traditional equitable discretion. *Id.* In reversing this decision, the Court emphasized that the judicial authority to grant injunctive relief is fundamentally rooted in principles of equity: "The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Id.* at 312. The Court confirmed the four-factor test, which incorporates these equitable considerations, as the applicable standard for injunctive relief. *Id.* at 312-13. In this regard, it described the high standard for overcoming the presumption that the four-factor test applies: "Unless a statute, in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Id.* at 313 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).

The Court reiterated this point in *Winter*. In that case, environmental groups sought to enjoin the Navy from conducting sonar training exercises off the coast of southern California on the ground that the sonar devices harmed marine mammals. 555 U.S. at 12-14. Despite the absence of any evidence that marine mammals had been harmed by the Navy's training exercises, *id.* at 12, the district court granted the injunction and the Ninth Circuit affirmed based on a "possibility of irreparable injury." 518 F.3d 658, 696 (9th Cir. 2008). In overturning the injunction, the Court reaffirmed the four-factor equitable requirements, asserting that plaintiffs "must" satisfy them to qualify for injunctive relief. 555 U.S. at 20. In this respect, the Court rejected the Ninth Circuit's standard as "too lenient," holding that irreparable injury must be "*likely* in the absence of an injunction," because a lower standard of a mere possibility "is

15

inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

The District Court in the present matter opined that these two cases "suggest a clear and consistent message to the lower courts: courts are to apply the traditional four-factor test in the absence of a 'necessary and inescapable' congressional intent to depart from traditional equitable standards. § 10(j) lacks such intent." *Chester*, 2011 WL 2517037 at *4 (citing *Romero-Barcelo*, 456 U.S. at 313). In our view, neither *Romero-Barcelo* nor *Winter* present a conflict with our § 10(j) rulings sufficient to enable us to reverse nearly forty years of precedent.

First, neither *Romero-Barcelo* nor *Winter* involved statutory schemes analogous to the NLRA. Notwithstanding the broad language endorsing the primacy of the four-factor test, the Court rendered its decisions in those cases on facts that presented the standard scenario for courts granting injunctive relief. In both cases, plaintiffs sought injunctions from district courts that also had full jurisdiction to decide the merits of the alleged statutory violations. *See Romero-Barcelo*, 456 U.S. at 307-308; *Winter*, 555 U.S. at 16-17. In the context of such generic circumstances, where the courts' jurisdiction over the merits was not otherwise restricted, the Court had no occasion to qualify or condition its broad affirmation of the full scope of equity discretion.

Nothing in these cases suggests that the Court contemplated the relatively unusual scenario of interim injunctive relief in the context of a pending unfair labor practice proceeding. In light of the purposes behind this

16

provision and the Act, we believe that the holdings in *Romero-Barcelo* and *Winter* do not extend to the § 10(j) context. Indeed, the NLRA erects a unique statutory scheme: it authorizes district courts to grant interim injunctive relief in labor dispute cases, an entire category over which they have no jurisdiction to decide the merits. Instead, Congress designated the NLRB as the entity with the requisite expertise in unfair labor practices, and the merits of those claims are adjudicated through an administrative process that is largely independent of the courts.

This specialized scheme distinguishes § 10(j) injunctive relief from the generic context, where district courts determine whether to grant relief in cases over which they possess both the jurisdiction and competence to decide the merits. Congress' clear purpose in creating § 10(j) was not to limit the scope of the Board's authority to decide violations, but to preserve its powers to do so by giving the NLRB an opportunity to seek an injunction of alleged violations before an injury becomes permanent or the Board's remedial purpose becomes meaningless.

Moreover, the Board does not seek interim equitable relief to vindicate private rights, but acts instead in the public interest.[8] *See Vibra Screw*, 904 F.2d at 876. This factor also

---

[8] The Board's decision to initiate § 10(j) proceedings follows a multi-step investigation and evaluation process. *See* Office of the Gen. Counsel, U.S. Nat'l Labor Relations Bd., Electronic Redacted Section 10(j) Manual Users Guide 11-14 (2002). The local region of the Board first conducts an investigation and evaluation of the unfair labor practice charge that mirror the two-part inquiry. In its investigation, the Board determines "whether there is evidence establishing

distinguishes § 10(j) petitions from ordinary preliminary injunction motions. Section 10(j) does not so expand the scope of the district court's role in labor disputes as to permit it to intrude upon the Board's exclusive authority to decide the merits of the cases. The legislative scheme is therefore inconsistent with a full grant of equity jurisdiction to the district courts, which would permit them to exercise their own discretion in evaluating the likelihood of success on the merits, thereby infringing on the province of the Board. We do not believe the Court intended its decisions in *Romero-Barcelo* or *Winter* to extend to the context of such a distinct statutory scheme. We therefore conclude that those cases are not conflicting authorities that require us to reverse our established precedent.

Notably, three of our sister circuits have retained the two-part test in spite of *Romero-Barcelo* and *Winter*. In *Overstreet*, the Fifth Circuit rejected arguments advanced in the respondent's briefs that *Romero-Barcelo* required the four-part test. 625 F.3d at 851; Brief of Appellant at 36, Overstreet v. El Paso Disposal, L.P., 625 F.3d 844 (5th Cir. 2010) (No. 09-51006). The Court distinguished § 10(j) from

a violation of the Act" and also "whether a Board order in due course will be inadequate to protect statutory rights." *Id.* at 10. After its investigation, the Board decides "whether 10(j) proceedings are appropriate" by considering the evidence, threat of remedial failure, and "just and proper" theories and evidence. *Id.* at 11. The region may then submit a recommendation for § 10(j) proceedings to the Board's General Counsel, who reviews the evidence and may submit a request for 10(j) injunctive relief to the Board, which makes the final decision authorizing or denying a § 10 (j) petition. *Id.* at 12-14.

other injunctive relief when it observed that the "'traditional rules of equity may not control the proper scope of § 10 (j) relief,'" and explained: "A requirement…to make the NLRB show 'irreparable harm' and 'likelihood of success' for § 10(j) relief would raise the factual threshold that the NLRB must reach.  Nothing in…our case law[] supports replacing the [two-part] test we currently use with" a test that incorporates the "traditional four-part test for equitable relief."  625 F.3d at 851 (quoting *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1192-93 (5th Cir. 1975).  *See also Ahearn*, 351 F.3d at 235 ("If the current 10(j) standard were in clear contravention of Supreme Court precedent, it seems unlikely that this or any other circuit would have continued to adhere to it for two decades without concern."); *Webco*, 225 F.3d at 1137 ("[W]e will not reconsider this circuit's longstanding *Angle* two-part test in favor of a traditional equitable analysis.").

Indeed, even those courts of appeals that have viewed *Romero-Barcelo* and *Winter* as requiring the four-part equitable test for § 10(j) relief have made modifications to the four-part test to accommodate the purposes and goals of the NLRA.  For example, the Ninth Circuit has explained that courts must consider the four equitable criteria "through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge."  *Miller*, 19 F.3d at 459-60.  The *Miller* Court also observed that it is "necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals."  *Id.* at 460.  Accordingly, that Court holds that "the Board can make a threshold showing of likelihood of success

19

by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Id*.

The Fourth Circuit, holding that *Romero-Barcelo* required it to apply the four-part test to § 10(j), was careful to note: "But, of course, district courts should apply this test in light of the underlying purpose of § 10(j): preserving the Board's remedial power pending the outcome of its administrative proceedings." *Spartan Mining*, 570 F.3d at 543. *See also Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 287 (7th Cir. 2001) ("But, in evaluating the likelihood of success, it is not the district court's responsibility, nor is it ours, to rule on the merits of the Director's complaint; that is the Board's province. The court's inquiry is confined to the *probability* that the Director will prevail."). Similarly, the Second Circuit, which applies a hybrid test, follows the same considerations when applying the four-part test under its "just and proper" prong. *See, e.g., Hoffman*, 247 F.3d at 368.

Thus, even the courts that follow *Romero-Barcelo* account for the relatively unique context and purposes of § 10(j), and none interprets the Court's precedent as permitting the district courts to have full equity jurisdiction in this context. If even the courts of appeals that apply the traditional four factors for preliminary injunctions to this context do not do so strictly, we comfortably conclude that the Supreme Court rulings do not so clearly conflict with our precedent as to mandate our abrogation of that precedent.

Even assuming *arguendo* that the Court's decisions apply to § 10(j) relief, we do not believe that our two-part standard is necessarily incompatible with the requirements of the traditional four-part test. The District Court opined that our two-prong approach to § 10(j) petitions fails to

20

encompass the quartet of considerations ordinarily governing preliminary injunction motions.  The Court explicated: "The Third Circuit's § 10(j) standard does not even require a showing of a 'possibility' of harm; only a showing of 'reasonable cause' that a labor violation occurred."  *Chester,* 2011 WL 2517037 at *9.  It also asserted that the two-part test does not take into account the public interest or a balancing of harms: "The Third Circuit standard, other than references to 'just and proper' remedies, does not explicitly countenance these two crucial equitable factors."  *Id.*  It further claimed, "[u]nder the Third Circuit's precedents, no showing of harm is required," *id.* at 12, and "merely a showing of 'reasonable cause' that a labor violation occurred is sufficient to issue an injunction, if said relief is 'just and proper.'"  *Id.*

The District Court's conclusions about the test misapprehend our guidance with respect to district court consideration of § 10(j) petitions.  In this regard, it is simply not true that the two-part test only requires "reasonable cause" to believe the Director will prevail before the Board.  Quite to the contrary, the test incorporates various considerations that correspond to each of the *Winter* factors.

As an initial matter, it bears explaining that the "reasonable cause" analysis is not the deferential rubber stamp that the District Court and Grane characterize it to be.  To establish reasonable cause in the Third Circuit, "there must be a substantial, non-frivolous, legal theory, implicit or explicit, in the Board's argument, and second, taking the facts favorably to the Board, there must be sufficient evidence to support that theory."  *Vibra Screw*, 904 F.2d at 882.  Significantly, the circuits that apply the four-part test use a

21

substantially similar standard.  *See, e.g.*, *Miller,* 19 F.3d at 460.

Moreover, "[t]he Chancellor does not abdicate his powers merely upon a showing that the Regional Director's theories surpass frivolity.  He maintains some power to do equity and mold each decree to the necessities of the case." *Pilot Freight Carriers*, 515 F.2d at 1192-93 (citation omitted).  In other words, the § 10(j) inquiry "necessarily subsumes equitable considerations."  *Webco*, 225 F.3d at 1137, n.3.

The standard we use to determine whether injunctive relief would be just and proper is "informed by the policies underlying § 10(j)," *Dorsey Trailers*, 147 F.3d at 247, looking in particular to "the general communication the law-making bodies were attempting to send to the courts and the public in passing the relevant act." *Suburban Lines*, 731 F.2d at 1090. "In fashioning this provision, Congress sought to ensure that the Board would be able to exercise effectively its ultimate remedial power." *Eisenberg ex rel. N.L.R.B. v. Lenape Products, Inc.*, 781 F.2d 999, 1003 (3d Cir. 1986).  "[T]he focus in a § 10(j) determination is on the public interest, and 'the *unusual* likelihood . . . of ultimate remedial failure' by the NLRB." *Dorsey Trailers*, 147 F.3d at 247 (citation omitted) (quoting *Suburban Lines*, 731 F.2d at 1091 n.26). *See also Vibra Screw*, 904 F.2d at 879 ("[T]he critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired."); *Lenape Products*, 781 F.2d at 1003 ("[T]he district court must find that the issuance of an injunction is 'just and proper,' i.e., that it is in the public interest to grant the injunction, so as to effectuate the policies

of the National Labor Relations Act or to fulfill the remedial function of the Board.") (citing *Wellington Hall*, 651 F.2d at 906-07).

Therefore, the goal of preserving the Board's ultimate remedial power guides the courts to focus on whether the ongoing practices would create "irreparable" harms, i.e., injuries that could not be remedied by the Board's final decision. In conducting this inquiry, the courts weigh the same kinds of harms that factor into the traditional equitable test. They consider the "likelihood of harm to the bargaining process," *Dorsey Trailers*, 147 F.3d at 247 (citation omitted), and the overall public interest in "the promot[ion] of wholesome and mutually acceptable labor relations and the settlement of labor disputes through collective bargaining between employees and their employer." *Vibra Screw*, 904 F.2d at 876 (citation omitted). In evaluating the net benefits of injunctive relief, the courts also weigh the relative harms it may prevent against the harms it may produce. *Id.* at 878-79 (evaluating how "the chilling effect of management retaliation may outlast the curative effects of any remedial action the Board might take . . . ."). The Courts do not only weigh the harms to the Board, but also the harms injunctive relief poses to the employer. *See, e.g.*, *Wellington Hall*, 651 F.2d at 907.

Indeed, we have denied injunctive relief where we found insufficient evidence of irreparable harm, making interim equitable relief not "just and proper." *See, e.g.*, *Suburban Lines*, 731 F.2d at 1095; *Hartz Mountain*, 519 F.2d at 143. For instance, we affirmed the denial of § 10 (j) relief in *Suburban Lines* because "failure to grant interim reinstatement relief could not produce irreparable injury" and

23

"erroneously granted interim relief would irreparably injure" certain employees and the respondent in that case. 731 F.2d at 1092. In *Lenape Products*, 781 F.2d at 1003-04, we held that § 10 (j) relief was not warranted because "there was no evidence that union activity would be 'chilled'" and because "the size and intimacy of the group of the employees who walked out was such that if the Board ultimately orders reinstatement, its organizational efforts could be resumed."

In summary, the two-part test does incorporate equitable factors into its analysis that other circuits consider when applying the four-part test to § 10(j) relief. The reasonable cause prong has substantial overlap with the likelihood-of-success inquiry. Likewise, the "just and proper" prong collapses the other three equitable factors into one comprehensive analysis. Under this inquiry, the court determines whether an injunction is necessary to preserve the Board's remedial powers, which incorporates a weighing of relative harms to the bargaining process, employees' rights, and the likelihood of restoring the status quo absent injunctive relief, along with the public interests implicated by the labor disputes. In light of these substantial similarities, we think that even if the Court's decisions in *Romero-Barcelo* and *Winter* apply to the context of § 10(j) relief, our two-part test substantially complies with the requirements insofar as it does analyze each of the equitable factors.

The primary difference is that the two-part test accommodates the purposes of § 10(j) by granting a sufficient measure of deference to the Board to prevent the district court from overstepping its bounds and deciding the merits of alleged unfair labor practices. As this Court has explained, the "just and proper" standard in § 10(j) is intended to limit

24

the district court's role: "the phrase 'just and proper' [is] a method of cabining the otherwise unfettered discretion of the district court to fashion labor law under section 10(j) wholly according to its own notions of fairness and efficiency." *Suburban Lines*, 731 F.2d at 1089. *See also Ahearn*, 351 F.3d at 237 ("A district court also must be mindful that '[p]roceedings pursuant to § 10(j) are subordinate to the unfair labor practice proceedings to be heard before the Board.'... Consequently, it is not the job of the district court, in considering a § 10(j) petition, 'to adjudicate the merits of the unfair labor practice case.'") (citation omitted) (quoting *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 28 (6th Cir. 1988)). Accordingly, the District Court erred in rejecting our two-prong test for § 10(j) petitions.

## III.  Merits of § 10(j) Petition

### A. Interim Bargaining Order

Having concluded that the district court applied the incorrect legal standard to the Director's § 10(j) petition, we turn now to consider whether the court erred in granting the interim bargaining order. Although the district court applied the incorrect four-part standard in evaluating the Director's § 10(j) petition, we find it unnecessary to remand this issue for analysis under the two-part test, which involves analysis of similar factors under a less strict standard.[9] We think the

---

[9] *See, e.g.*, *Vibra Screw*, 904 F.2d at 878, 879, 882 (where the district court based its "just and proper" analysis on the wrong standard, and did not address the "reasonable cause" prong, the Third Circuit declined to remand, and instead made the "exceedingly simple" reasonable cause determination itself, found that the injunction was "just and

25

undisputed facts on the record show that the interim bargaining order is plainly warranted under the two-part test.

### 1. Reasonable Cause

To establish reasonable cause to believe that the Director is likely to prevail on his claim, we must find that this claim is based on a legal theory that is "substantial and not frivolous" and that the facts, when taken in a favorable light to the Board, are sufficient to support that theory. *Vibra Screw*, 904 F.2d at 882. In evaluating reasonable cause, we are mindful that it is not our role to adjudicate the merits of the underlying claim.

Under § 8(a)(5) of the Act, an employer has a duty to "bargain collectively with the representatives of his employees, subject to the provisions of [section 9(a)] of this title." 29 U.S.C. §§ 158(a)(5). A new employer has a duty under § 8(a)(5) to bargain with the incumbent union that represented the predecessor's employees when there is a "substantial continuity" between the predecessor and successor enterprises. *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 43 (1987).[10] This includes such

proper," and remanded the case with directions to grant injunction); *Frye ex rel. N.L.R.B. v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1225 (6th Cir. 1993) (where the district court did not apply the correct standard for § 10(j) relief, the Sixth Circuit declined to remand and decided the question itself).

[10] Other factors reflective of continuity include similarity between, *inter alia*, the business operations, services provided, customers, jobs performed by employees, and working conditions. *Fall River*, 482 U.S. at 43.

26

continuity of the workforce that the new employer "would confront the same union representing most of the same employees in the same unit." *N.L.R.B. v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 280 n.4 (1972). The question of whether there is reasonable cause to believe that Grane's conduct constitutes an unfair labor practice depends on whether there is reasonable cause to believe that the Director will prevail on his claim that Grane is a legal successor to Cambria County, and therefore had a duty to recognize and bargain with Local 1305.

Grane does not dispute that the facts on the record satisfy the standard for substantial continuity: it did hire a majority of the Laurel Crest employees and continues the operations of Laurel Crest as a nursing home. However, notwithstanding that it qualifies as a successor employer under the substantial continuity test, Grane contends that successorship principles do not apply in the context of a transition from a public to private employer. In this respect, Grane observes that because Cambria County was a "public employer" under the terms of state labor law, PERA, 43 P.S. § 1101.301(1), and was expressly excluded from coverage under the NLRA, Grane therefore cannot be a "predecessor employer" under the Act. Likewise, it argues that because Local 1305 was certified under state labor laws rather than the Act, it too cannot qualify as an "incumbent Union" within the terms of the Act.

The gravamen of Grane's arguments is that the successorship principle has no application in the context of a transition from public to private employers. In this regard, it explains that Local 1305 is not a "labor organization" within the terms of section 9(a) of the Act because it "has never been

27

'selected' by 'employees' of an 'employer' under Section 9(a)." (Grane's Br. at 25.)[11]  As a result, Grane observes that neither Local 1305 nor Cambria County "had any status under the Act before January 1, 2010," and that Grane therefore "has been placed into the metaphysical quandary of being the successor employer to a non-existent predecessor."  (*Id.* at 26).

It is not our task to decide the merits of Grane's arguments that successorship principles should be applied in the context of public to private transitions.  Rather, our "reasonable cause" inquiry directs us to examine whether the Director's legal theory is "substantial and non-frivolous."  We have little difficulty concluding that standard is met, and there is reasonable cause to believe that the Director will prevail in establishing that Grane is a successor employer.

The Director's successorship theory is hardly a novel legal position.  In several cases, the courts and the Board have applied successorship principles in the context of the public to private transition.  In *Dean Transp., Inc.*, 350 NLRB 48 (2007), *enf'd*, 551 F.3d 1055 (D.C. Cir. 2009), the Board held that a union certified by a state agency was a labor organization under the Act, and the fact that the predecessor was a public employer did not prevent the court from imposing a successorship obligation on the private employer.

---

[11] Section 9(a) states: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining."  29 U.S.C. § 159(a).

*Id.* at 50-51. In applying the *Fall River* "substantial continuity" test, the Board noted that it "has applied this test even where, as here, the predecessor is a public entity." 350 NLRB at 58. *See also Cmty Hospitals of Cent. Cal. v. N.L.R.B.*, 335 F.3d 1079, 1084 (D.C. Cir. 2003) ("The change from public to private ownership of the hospital does not undermine the Board's finding that Community was a successor."); *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 573 (7th Cir. 2011) (noting "[t]he solid line of cases . . . support[ing] the district court's conclusion that the Director is likely to succeed on the merits" of his successorship claim in the context of a public to private transition); *Van Lear Equip., Inc.,* 336 NLRB 1059, 1064 (2001) ("[T]he successorship doctrine continues to apply even though the predecessor . . . is a public employer."); *Lincoln Park Zoological Soc.*, 322 NLRB 263, 364-65 (1996), *enf'd* 116 F.3d 216, 220 (7th Cir. 1997) (applying the successorship principle in the context of a public to private transition).

In light of this case law it is evident that there is reasonable cause for the charge that Grane's refusal to recognize and bargain with the incumbent union, Local 1305, is a violation of the Act.

## 2. Just and Proper

To determine whether injunctive relief is "just and proper," we consider the "policies underlying § 10(j)," *Dorsey Trailers*, 147 F.3d at 247, including the public interest in "the settlement of labor disputes through collective bargaining," *Vibra Screw*, 904 F.2d at 876 (quoting *Hartz Mountain*, 519 F.2d at 142), and "whether the failure to grant interim injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising

29

its ultimate remedial powers." *Suburban Lines*, 731 F.2d at 1091-92. The Director argues that the interim bargaining order is just and proper because Grane's current refusal to recognize or bargain with Local 1305 is depriving employees of the benefits of collective bargaining and causing irreparable erosion of Union support. The Director argues that this damage will render the Board's ultimate remedial order ineffective. Grane contends that the Director's evidence is inadequate to substantiate these claims, disputing several factual claims made by the Director and arguing that the lack of adequate evidence to establish a threat to the Board's remedial authority forecloses a finding that the bargaining order is just and proper.

To establish the chilling effect that Grane's conduct has had on the employees, the Director cites testimony adduced at the ALJ hearings from current and former Laurel Crest employees and Local 1305 officers. Their testimony cited conversations with five identified employees, who had reportedly said that they felt that they were being watched by Grane officials; were scared to support the Union; were constantly reminded that there was no union; and expressed concerns about the Union's status and future. The testimony also establishes that other public Union activities, including regular meetings and pre-takeover picketing, have ceased since Grane's refusal to recognize Local 1305. Grane contends that this evidence is insufficient to prove that the Union's loss of support will cause irreparable harm, and argues that Union support was tepid to begin with. In this respect, Grane cites the attendance records of the Union meetings. Because the parties dispute the total number of Local 1305 members, the parties also dispute the relevance of these records as a measure of Union support.

It is well-recognized that when a successor employer refuses to recognize an incumbent union, it "inflicts a particularly potent wound on the union and its members." *Bloedorn*, 276 F.3d at 298. Indeed, "[g]iven the uncertainties that both the union and its members face during the transition," a successor's denial of recognition "disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Id.* (quoting *Fall River*, 482 U.S. at 49-50). An ultimate Board order that Grane recognize the Union may be ineffective if the Union has lost significant support.

Moreover, a bargaining order is also necessary to preserve the "fruits of the collective bargaining process that otherwise would have been available" to the employees prior to such an order. *Suburban Lines*, 731 F.2d at 1093. The courts have recognized this harm as a basis for injunctive relief even under the stringent four-factor test. *See, e.g.*, *Bloedorn*, 276 F.3d at 299 ("Meanwhile, the RSI employees whom FFI did hire are working without the advocacy of their chosen representative. Assuming that the Board ultimately orders FFI to bargain with the Union, such a forward-looking order cannot fully compensate the employees of FFI for the variety of benefits that good-faith collective bargaining with the Union might otherwise have secured for them in the present."). For these reasons, we find that the interim bargaining order is necessary to preserve the Board's remedial powers, and therefore is "just and proper."

### B. Interim Instatement Order

Finally, we turn to the district court's denial of the interim instatement order for Hagerich and Mulhearn. The District Court denied this order under the more demanding

31

standard of the four-part test. Unlike the interim bargaining order, however, we do not think there are sufficient undisputed facts on the record for this Court to evaluate whether the order should be granted under the two-part test. We therefore remand this aspect of the Director's petition to the District Court to conduct an analysis of the facts under the two-part test.

## IV.   Conclusion

For the reasons stated above, we affirm the District Court's grant of the interim bargaining order, but remand the Director's request for an interim instatement order to the District Court to determine whether relief is appropriate under the two-part test.